## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | Civil Action No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| DB STRUCTURED PRODUCTS, INC.; DEUTSCHE ALT-A SECURITIES, INC.; ACE SECURITIES CORP.; DEUTSCHE BANK SECURITIES INC.; ANILESH AHUJA; JEFFREY LEHOCKY; MICHAEL COMMAROTO; JOSEPH RICE; RICHARD D'ALBERT; RICHARD FERGUSON; DOUGLAS JOHNSON; EVELYN ECHEVARRIA; and JULIANA JOHNSON, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual"), by and through its attorneys, brings this action against DB Structured Products, Inc.; Deutsche Alt-A Securities, Inc.; ACE Securities Corp.; and Deutsche Bank Securities Inc. (collectively, "DB" or the "DB Defendants"); and Anilesh Ahuja; Jeffrey Lehocky; Michael Commaroto; Joseph Rice; Richard D'Albert; Richard Ferguson; Douglas Johnson; Evelyn Echevarria; and Juliana Johnson (collectively, the "Officer Defendants"), and alleges as follows:

## NATURE OF ACTION

1.      This action arises out of the sale of certain residential mortgage-backed securities (the "Certificates") to MassMutual.  The Certificates were sold pursuant to public filings and offering materials that contained untrue statements and omissions of material facts, in violation of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410.

2.      In 2004, DB Structured Products, Inc. ("DB Structured Products") began securitizing residential mortgage loans to take advantage of the exploding market for residential mortgage-backed securities.  DB Structured Products purchased mortgage loans from third-party originators that could not be sold to the Federal Home Loan Mortgage Corporation ("Freddie Mac") or the Federal National Mortgage Association ("Fannie Mae").  Instead, the DB Defendants securitized these non-conforming loans for sale to investors, such as MassMutual. They earned substantial profits securitizing and selling the loans, but they purportedly transferred the risk of default on the loans to investors.

3.      In marketing the Certificates to MassMutual, the DB Defendants represented that the loans backing the securities were underwritten in accordance with prudent underwriting standards that ensured a borrower could repay the loan.  The DB Defendants also represented that the loans had certain characteristics, including defined loan-to-value ratios and specific owner-occupancy statistics.

4.      These representations were material to MassMutual's decision to purchase the Certificates.  The DB Defendants were the exclusive source of information regarding the loans backing the securities.  Unlike the DB Defendants, MassMutual did not have access to loan files. MassMutual therefore depended on the DB Defendants to verify that the information presented to it and other investors was true and accurate.

5.      In reality, however, the loans backing the Certificates deviated substantially from what was represented to MassMutual.  To obtain an ever-growing volume of loans to sell to investors, the DB Defendants disregarded or abandoned underwriting guidelines, often purchasing loans issued to borrowers regardless of ability to repay.  The loans were issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and exceptions to underwriting criteria that had no proper justification.

6.      Just years after MassMutual purchased the Certificates, they now qualify as junk. In a majority of the 11 securitizations in which MassMutual purchased Certificates, over 40% of the loans backing the securities have now defaulted, have been foreclosed upon, or are delinquent.  Indeed, the defaults, foreclosures, and delinquencies have reached more than 60% in some securitizations.  A subsequent forensic analysis commissioned by MassMutual has demonstrated that the representations about the loans in all the securitizations were materially false.  Under the Massachusetts Uniform Securities Act, MassMutual is entitled to rescind its purchase of these securities and/or recover appropriate damages.

## PARTIES

### A.      Plaintiffs

7.      Plaintiff Massachusetts Mutual Life Insurance Company is a Massachusetts mutual life insurance company with its principal place of business in Springfield, Massachusetts. Founded in 1851, MassMutual is a leading, diversified financial services organization providing

life insurance, disability income insurance, long-term care insurance, annuities, retirement and income products, investment management, mutual funds, and trust services to individual and institutional customers.

**B.** **DB Defendants**

8.       Defendant DB Structured Products, Inc. ("DB Structured Products") is a Delaware corporation with its principal place of business in New York, New York.  DB Structured Products was the Sponsor for all 11 securitizations at issue in this action.

9.       Defendant Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A") is a Delaware corporation with its principal place of business in New York, New York.  Deutsche Alt-A is a wholly owned subsidiary of DB Structured Products.  Deutsche Alt-A was the Depositor for five of the 11 securitizations at issue in this action.

10.       Defendant ACE Securities Corp. ("ACE") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  ACE is a wholly owned subsidiary of Altamont Holdings Corp. ("Altamont").  ACE was the Depositor for six of the 11 securitizations at issue in this action.

11.       Defendant Deutsche Bank Securities Inc. ("DB Securities") is a Delaware corporation with its principal place of business in New York, New York.  DB Securities is an indirect subsidiary of Deutsche Bank AG, a German corporation.  DB Securities was the Underwriter for all 11 of the securitizations at issue in this action.

**C.** **Officer Defendants**

12.       Defendant Anilesh Ahuja is an individual residing in New York.  Ahuja was Global Head of Deutsche Bank's Residential Mortgage-Backed Securities Group, where he managed over $80 billion in assets and more than 2,000 employees.  Prior to joining Deutsche Bank, Ahuja spent eight years at RBS Greenwich Capital, where his responsibilities included

trading, origination, and risk management of mortgages and mortgage-backed securities. Ahuja served as President of Deutsche Alt-A, and signed registration statements for five of the 11 securitizations at issue in this action.

13.     Defendant Jeffrey Lehocky is an individual residing in New Jersey. Lehocky was a Managing Director and Chief Financial Officer at Deutsche Bank. He served as the Treasurer and a Director of Deutsche Alt-A, and signed registration statements for five of the 11 securitizations at issue in this action.

14.     Defendant Michael Commaroto is an individual residing in New York. Commaroto was head of Deutsche Bank's private label mortgage-backed securities and home equity whole loan trading groups. Prior to 2005, he was President of Deutsche Alt-A, when he was replaced by Ahuja and became a director of Deutsche Alt-A. Commaroto also served as an officer of DB Structured Products. Commaroto signed registration statements for one of the securitizations at issue in this action.

15.     Defendant Joseph Rice is an individual residing in New York. Rice served as an officer of DB Structured Products and a director of Deutsche Alt-A. He signed registration statements for five of the 11 securitizations at issue in this action.

16.     Defendant Richard D'Albert is an individual residing in New York. D'Albert worked for Deutsche Bank's Securitized Products Group, concentrating on United States securitizations, since 2004. In May 2006, he was appointed Global Head of the Securitized Products Group. D'Albert also served as a director of Deutsche Alt-A, and signed registration statements for five of the 11 securitizations at issue in this action.

17.     Defendant Richard Ferguson is an individual residing in New York. Ferguson was a Managing Director and Treasurer of the Americas of Deutsche Bank. He served as a

director of Deutsche Alt-A, and signed registration statements for four of the 11 securitizations at issue in this action.

18.     Defendant Douglas Johnson is an individual residing in North Carolina.  Johnson was the President and a Director of ACE, along with the President of its parent, Altamont.  Douglas Johnson signed registration statements for six of the 11 securitizations at issue in this action.

19.     Defendant Evelyn Echevarria is an individual residing in North Carolina.  Echevarria was the Secretary and a Director of ACE, along with a Vice President of its parent, Altamont.  Echevarria signed registration statements for six of the 11 securitizations at issue in this action.

20.     Defendant Juliana Johnson is an individual residing in North Carolina.  Johnson was the Treasurer and a Director of ACE, along with a Vice President of its parent, Altamont.  Juliana Johnson signed registration statements for six of the 11 securitizations at issue in this action.

**D.    <u>Relevant Non-Parties</u>**

21.     The Certificates for each securitization relevant to this action were issued by a trust established by the Depositor.  The 11 issuing trusts (collectively, the "Trusts") were: Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1; Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2; Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3; Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5; Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6; ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4; ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1; ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3; ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4; ACE Securities Corp. Home Equity

Loan Trust, Series 2007-SL1; and ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2.

22.     At all relevant times, the defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of corporate defendants mean that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     This Court has personal jurisdiction over the defendants by virtue of their securities sales to MassMutual in Massachusetts.

25.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391, because substantial events giving rise to this Complaint took place in Massachusetts.

## SUBSTANTIVE ALLEGATIONS

26.     DB Structured Products sponsored all the securitizations at issue in this action.  It began securitizing residential mortgage loans in 2004 to take advantage of the exploding market for residential mortgage-backed securities.  DB Structured Products did not originate any of the mortgage loans it securitized; it purchased all the mortgage loans from third-party originators.

## I.     THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES

27.     In the 1980's and 1990's, mortgage originators followed a traditional model for originating mortgage loans.  Under the traditional model, they either held the mortgage loans

they provided to borrowers through the terms of the loans, or sold the mortgage loans to governmental agencies Fannie Mae and Freddie Mac.

28.     Loans held by mortgage originators were typically conservative, first-lien loans to prime borrowers because the originator would profit if the borrower made timely interest and principal payments, but would bear the loss if the borrower defaulted and the property value was insufficient to repay the loan.  As a result, the originator had economic incentives to establish the creditworthiness of the borrower and the true value of the underlying property by appraising it fairly before issuing the mortgage loan.

29.     Loans sold to Fannie Mae and Freddie Mac were also conservative loans to prime borrowers because the loans had to meet specific guidelines for sale.  By law, Fannie Mae and Freddie Mac can purchase only those mortgage loans that conform to certain regulatory guidelines.  These loans are known in the industry as conforming loans, and are historically the most conservative loans with the lowest rates of delinquency and default.  Mortgage loans that fail to meet the regulatory guidelines are known in the industry as non-conforming loans.

30.     In the 1980's and 1990's, Fannie Mae and Freddie Mac securitized the loans they purchased from mortgage originators and sold the securities backed by the loans, referred to as residential mortgage-backed securities, to investors.  Investors in these early mortgage-backed securities were provided protections not only because the underlying loans conformed to strict regulatory guidelines, but also because Fannie Mae and Freddie Mac guaranteed that investors would receive timely payments of principal and interest. Because Fannie Mae and Freddie Mac were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

31.     In the early 2000's, the demand for securities backed by mortgage loans increased.  Private financial institutions stepped in to meet the demand by originating an ever-growing number of non-conforming loans, such as loans based on reduced documentation, loans issued to subprime borrowers, and adjustable loans where the interest rate increases after a period of time.  These loans were then securitized for sale to private investors.  By 2001, $240 billion in residential mortgage-backed securities were issued through private securitizations.  By 2006, that amount had increased by almost five times – to $1.033 trillion.

32.     DB Structure Products began securitizing residential mortgage loans in 2004 to take advantage of this exploding market.  In 2004, DB Structured Products purchased and securitized approximately $7.7 billion in residential mortgage loans, using both prime and subprime loans.  In 2005, DB Structured Products more than doubled the volume of loans it securitized.  Between 2004 and 2005, it went from securitizing approximately $7.7 billion in residential mortgage loans to securitizing more than $18.4 billion in residential mortgage loans.  Despite this growth, DB Structured Products abandoned its purchases of prime loans.  Instead, it purchased subprime, Alt-A (between prime and subprime), and second-lien loans.  In 2006, DB Structured Products increased the volume of its securitizations again, purchasing and securitizing approximately $24 billion in residential mortgage loans.

## II.     THE SECURITIZATION PROCESS

33.     To create residential mortgage-backed securities, such as the Certificates purchased by MassMutual, a process known as mortgage securitization is used.  Mortgage loans are acquired from mortgage originators and pooled together, with securities constituting interests in the cash flow from the mortgage pools then sold to investors.  The securities are also referred to as mortgage pass-through securities because the cash flow from the pool of mortgages is

passed through to the securities holders when payments are made by the underlying mortgage borrowers.

34.     Each securitization involves several entities that perform distinct tasks.  The first step in creating a residential mortgage-backed security, such as the Certificates, is the acquisition by the Depositor of an inventory of mortgage loans from a Sponsor or seller, which either originates the loans or acquires the loans from other mortgage originators in exchange for cash. DB Structured Products, the Sponsor for the securitizations at issue, acquired all loans from other mortgage originators.

35.     To create securities backed by the mortgage loans, the Depositor then forms one or more mortgage pools with the inventory of loans and creates tranches of interests in the mortgage pools with various levels of seniority.  Interests in these tranches are then issued by the Depositor (who serves as the Issuer) through a trust in the form of bonds, or certificates.

36.     Each tranche has a different level of purported risk and reward, and, often, a different credit rating.  The most senior tranches often receive the highest investment grade rating (triple-A).  Junior tranches, which usually have lower ratings, are more exposed to risk, but offer higher potential returns.  The most senior tranches of securities will be entitled to payment in full before the junior tranches.  Conversely, losses on the underlying loans in the asset pool – whether due to default, delinquency, or otherwise – are allocated first to the most subordinate or junior tranche of securities, then to the tranche above that.  This hierarchy in the division of cash flows is referred to as the flow of funds or waterfall.

37.     The Depositor works with one or more of the nationally recognized credit-rating agencies to ensure that each tranche of the mortgage-backed securities receives the rating desired by the Depositor (and Underwriter).  Once the asset pool is securitized, the certificates are issued

to one or more Underwriters (typically Wall Street banks), who resell them to investors, such as MassMutual.

38.     Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends primarily on the credit quality of the loans in the mortgage pool, which often includes thousands of loans.  Detailed information about the credit quality of the loans is contained in the loan files developed and maintained by the mortgage originators when making the loans.  For residential mortgage loans, such as the loans that backed the Certificates purchased by MassMutual, each loan file normally contains documents including the borrower's application for the loan, verification of income, assets, and employment, references, credit reports, and an appraisal of the property that will secure the loan and provide the basis for other measures of credit quality, such as loan-to-value ratios, and occupancy status.  The loan file should also include notes from the person who underwrote the loan describing the loan's purported compliance with underwriting guidelines, and documentation of compensating factors that justified any departure from those standards.

39.     MassMutual and other investors do not have access to the loan files.  Instead, the Sponsor, Depositor, and Underwriter are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting this information in the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Materials") prepared for potential investors.  This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the Sponsor, Depositor, and Underwriter.

### III.   MASSMUTUAL'S PURCHASES OF DB CERTIFICATES

40.     MassMutual purchased Certificates sponsored by DB Structured Products between March 2006 and April 2007.  MassMutual made the following purchases of Certificates, representing a total investment of over $125 million, from the following defendants:

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1, Classes 1A4 and A3 | Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1 | $26,037,168.75 | DB Structured Products, Inc. (Sponsor)<br><br>Deutsche Alt-A Securities, Inc. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2, Class 1A2 | Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2 | $24,993,250.00 | DB Structured Products, Inc. (Sponsor)<br><br>Deutsche Alt-A Securities, Inc. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4, Class M8 | ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4 | $1,331,000.00 | DB Structured Products, Inc. (Sponsor)<br><br>ACE Securities Corp. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3, Class A1 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3 | $14,996,484.38 | DB Structured Products, Inc. (Sponsor)<br><br>Deutsche Alt-A Securities, Inc. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5, Classes M8 and M9 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 | $4,000,000.00 | DB Structured Products, Inc. (Sponsor)<br><br>Deutsche Alt-A Securities, Inc. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6, Class M8 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6 | $1,698,000.00 | DB Structured Products, Inc. (Sponsor)<br><br>Deutsche Alt-A Securities, Inc. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1, Class A2 | ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1 | $4,997,728.80 | DB Structured Products, Inc. (Sponsor)<br><br>ACE Securities Corp. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1, Class A2D | ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1 | $21,000,000.00 | DB Structured Products, Inc. (Sponsor)<br><br>ACE Securities Corp. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3, Class A2C | ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3 | $9,994,473.90 | DB Structured Products, Inc. (Sponsor)<br><br>ACE Securities Corp. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2, Class A2C | ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2 | $7,000,000.00 | DB Structured Products, Inc. (Sponsor)<br><br>ACE Securities Corp. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4, Class A2C | ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4 | $9,000,000.00 | DB Structured Products, Inc. (Sponsor)<br><br>ACE Securities Corp. (Depositor)<br><br>Deutsche Bank Securities, Inc. (Underwriter) |
| | | | |
| TOTAL | | $125,048,105.83 | |

## IV. DEFENDANTS' DISREGARD AND ABANDONMENT OF UNDERWRITING STANDARDS TO FACILITATE SALE OF LOW-QUALITY LOANS TO INVESTORS

### A. DB's Representations That Underwriting Standards Were Consistently Followed

41. The fundamental basis upon which residential mortgage-backed securities are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans. If the borrowers cannot pay, and the collateral is insufficient, the securities experience losses. For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the certificates, and the representations in the Offering Materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

42. As Sponsor of the securitizations at issue, DB Structured Products purchased loans from third-party originators. Each loan was purportedly underwritten according to a set of underwriting guidelines, which are specified criteria that the mortgage loans must meet depending upon the individual loan program and circumstances of each mortgage loan. In general, the underwriting guidelines stipulated what documentation was required to be included

in the mortgage loan files for each loan product (which may include, depending upon the loan product, verifications of income, assets, closing funds, and payment histories, among other things) and criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-to-value ("CLTV") ratios.

43.     The DB Defendants represented to investors, including MassMutual, that the securitized loans were underwritten according to meaningful underwriting standards.  As detailed below, for each securitization, the DB Defendants made specific representations about the originators' underwriting standards or DB Structured Products' own underwriting standards that it insisted the originators follow.

### (1)     Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1

44.     For the Series 2006-AF1 securitization, DB Structured Products purchased 23.39% of the mortgage loans backing the securities (based on total principal balance) from GreenPoint Mortgage Funding, Inc. ("GreenPoint"); 17.73% of the mortgage loans from IndyMac Bank, F.S.B.; 16.12% of the mortgage loans from American Home Mortgage Corp.; and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

45.     The Prospectus Supplement for the Series 2006-AF1 securitization made specific representations about GreenPoint's underwriting standards.

46.     The Prospectus Supplement represented that GreenPoint's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged

property as collateral. Exceptions to the guidelines are permitted
where compensating factors are present.

47.     The Prospectus Supplement further provided that Greenpoint calculated

borrowers' debt ratios to ensure that borrowers could make their monthly payments:

In determining whether a prospective mortgagor has sufficient
monthly income available to meet the mortgagor's monthly
obligation on the proposed mortgage loan and monthly housing
expenses and other financial obligations, GreenPoint generally
considers the ratio of those amounts to the proposed mortgagor's
monthly gross income. . . . The ratios generally are limited to 40%
but may be extended to 50% with adequate compensating factors,
such as disposable income, reserves, higher FICO credit score, or
lower LTV's.

48.     To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that GreenPoint collected information about the borrower's income:

As part of its evaluation of potential mortgagors, GreenPoint
generally requires a description of the mortgagor's income. If
required by its underwriting guidelines, GreenPoint obtains
employment verification providing current and historical income
information and/or a telephonic employment confirmation.
Employment verification may be obtained through analysis of the
prospective mortgagor's recent pay stubs and/or W-2 forms for the
most recent two years or relevant portions of the mortgagor's most
recent two years' tax returns, or from the prospective mortgagor's
employer, wherein the employer reports the mortgagor's length of
employment and current salary with that organization. Self-
employed prospective mortgagors generally are required to submit
relevant portions of their federal tax returns for the past two years.

49.     The Prospectus Supplement represented that GreenPoint applied conservative

underwriting guidelines even to loans originated under "limited documentation" or "no

documentation programs:

Mortgage loans underwritten under this type of program are
generally limited to mortgagors with credit histories that
demonstrate an established ability to repay indebtedness in a
timely fashion . . . .  Permitted maximum loan-to-value ratios
(including secondary financing) under limited documentation
programs are generally more restrictive than mortgage loans

originated with full documentation requirements. Under no documentation programs, . . . [e]mphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective mortgagor, rather than on verified income and assets of the mortgagor. . . .  Mortgage loans underwritten under no documentation programs are generally limited to mortgagors with favorable credit histories and who satisfy other standards for limited documentation programs.

### (2) Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2

50.     For the Series 2006-AR2 securitization, DB Structured Products purchased 32.71% of the mortgage loans backing the securities (based on total principal balance) from Ohio Savings Bank ("OSB"); 20.44% of the mortgage loans from GreenPoint; 15.37% of the mortgage loans from American Home Mortgage Corporation; 12.55% of the mortgage loans from DHI Mortgage Company, Ltd.; and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

51.     The Prospectus Supplement for the Series 2006-AR2 securitization made specific representations about OSB and GreenPoint's underwriting standards.

52.     The Prospectus Supplement represented that OSB followed conservative underwriting guidelines:

The OSB underwriting guidelines and product guidelines for loans sold to DB Structured Products, Inc. generally follow standard Fannie Mae Guidelines, and are designed to evaluate the borrower's ability to repay the loan, their prior credit history, and availability of funds required for closing and cash reserves, as well as to evaluate the acceptability of the property to be mortgaged as collateral. OSB may consider a loan to have met its guidelines where specific criteria are not met if, under evaluation of all of the information available, acceptable compensating factors exist.

53.     The Prospectus Supplement further stated that OSB analyzed a borrower's income to ensure ability to repay:

> OSB requires that the prospective borrower's sources of income have the probability of continuing and are adequate to support the loan terms requested. The underwriter will review the prospective borrower's history of receiving stable income from employment (or other verifiable sources), as well as evaluating the likelihood that the income will continue to be received in the foreseeable future.

54. The Prospectus Supplement represented that OSB applied conservative underwriting guidelines even to loans originated under "limited documentation" or "no documentation programs:

> OSB offers several low or no document programs in which the prospective borrower's monthly income and/or asset level is accepted as stated on their application, and certain underwriting documentation regarding income or employment verification or asset documentation is waived. Generally, under these programs, greater reliance is placed on the value and adequacy of the mortgaged property as collateral, the prospective borrower's past credit performance and, if applicable, the level of liquid assets maintained by the prospective borrower. More restrictive loan-to-value maximums, and higher credit score requirements are generally applied to loans underwritten under these programs.

55. The Prospectus Supplement also provided:

> The underwriter will evaluate the intent and willingness of a borrower to repay the mortgage loan in a timely manner. In general, intent is evaluated based on past credit performance and the prospective borrower's equity. The prospective borrower's past regard for such obligations, and the source and amount of the down payment are also evaluated. OSB utilizes credit scores provided by credit reporting agencies to assist in the analysis of an applicant's credit history.

56. Additionally, the Prospectus Supplement represented that GreenPoint's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as

collateral.  Exceptions to the guidelines are permitted where
compensating factors are present.

57.     The Prospectus Supplement further provided that Greenpoint calculated

borrowers' debt ratios to ensure that borrowers could make their monthly payments:

> In determining whether a prospective borrower has sufficient
> monthly income available to meet the borrower's monthly
> obligation on the proposed mortgage loan and monthly housing
> expenses and other financial obligations, GreenPoint generally
> considers the ratio of those amounts to the proposed borrower's
> monthly gross income. . . .  The ratios generally are limited to 40%
> but may be extended to 50% with adequate compensating factors,
> such as disposable income, reserves, higher FICO credit score, or
> lower LTV's.

58.     To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that GreenPoint collected information about the borrower's income:

> As part of its evaluation of potential borrowers, GreenPoint
> generally requires a description of the borrower's income.  If
> required by its underwriting guidelines, GreenPoint obtains
> employment verification providing current and historical income
> information and/or a telephonic employment confirmation.
> Employment verification may be obtained through analysis of the
> prospective borrower's recent pay stubs and/or W-2 forms for the
> most recent two years or relevant portions of the borrower's most
> recent two years' tax returns, or from the prospective borrower's
> employer, wherein the employer reports the borrower's length of
> employment and current salary with that organization. Self-
> employed prospective borrowers generally are required to submit
> relevant portions of their federal tax returns for the past two years.

59.     The Prospectus Supplement represented that GreenPoint applied conservative

underwriting guidelines even to loans originated under "limited documentation" or "no

documentation programs:

> GreenPoint acquires or originates many mortgage loans under
> "limited documentation" or "no documentation" programs. Under
> limited documentation programs, more emphasis is placed on the
> value and adequacy of the mortgaged property as collateral, credit
> history and other assets of the borrower, than on verified income of
> the borrower.  Mortgage loans underwritten under this type of

> program are generally limited to borrowers with credit histories
> that demonstrate an established ability to repay indebtedness in a
> timely fashion . . . . Permitted maximum loan-to-value ratios
> (including secondary financing) under limited documentation
> programs are generally more restrictive than mortgage loans
> originated with full documentation requirements.  Under no
> documentation programs, . . . [e]mphasis is placed on the value and
> adequacy of the mortgaged property as collateral and the credit
> history of the prospective borrower, rather than on verified income
> and assets of the borrower. . . . Mortgage loans underwritten under
> no documentation programs are generally limited to borrowers
> with favorable credit histories and who satisfy other standards for
> limited documentation programs.

### (3)      ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4

60.     For the 2006-ASAP4 securitization, the Prospectus Supplement represented that

the third-party originators had used DB Structured Products' underwriting standards to originate

the mortgage loans backing the securities.

61.     The Prospectus Supplement represented that the underwriting standards were

consistently applied, even for non-conforming loans, to confirm a borrower's ability to repay and

the adequacy of the property as collateral:

> The Sponsor's underwriting standards are primarily intended to
> assess the ability and willingness of a borrower to repay the debt of
> the mortgage loan and to evaluate the adequacy of the related
> mortgaged property as collateral for the mortgage loan.  In
> underwriting a mortgage loan, the Sponsor considers, among other
> things, a mortgagor's credit history, repayment ability and debt
> service-to-income ratio (referred to in this section of the prospectus
> supplement as the "Debt Ratio"), as well as the value, type and use
> of the mortgaged property.

62.     The Prospectus Supplement also represented that only an "insignificant portion"

of the mortgage loans deviated from the underwriting guidelines, and that those loans had

sufficient compensating factors:

> All of the Mortgage Loans were reviewed by the Sponsor's
> contract underwriters.  On a case by case basis, the Sponsor may
> determine that, based upon compensating factors, a prospective

borrower who does not strictly qualify under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that an insignificant portion of the Mortgage Loans may represent such underwriting exceptions.

63.     Finally, the Prospectus Supplement represented that a number of quality control procedures were conducted to ensure adherence to underwriting standards and loan quality:

The Sponsor conducts a number of quality control procedures, including a full re-underwriting of a random selection of mortgage loans to assure asset quality. Under the asset quality procedure, a random selection of each month's originations is reviewed. The mortgage loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to management for response. The audit findings and management responses are then reviewed by the Sponsor's senior management. Adverse findings are tracked monthly and over a rolling six month period. This review procedure allows the Sponsor to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

**(4)     Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3**

64.     For the Series 2006-AR3 securitization, DB Structured Products purchased 44.70% of the mortgage loans backing the securities (based on total principal balance) from MortgageIT, Inc. ("MortgageIT"); 19.10% of the mortgage loans from Countrywide Home Loans, Inc. ("Countrywide"); and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

65.     The Prospectus Supplement for the Series 2006-AR3 securitization made specific representations about MortgageIT's and Countrywide's underwriting standards.

66. The Prospectus Supplement assured investors that MortgageIT underwrote loans based on a borrower's willingness and ability to repay:

> MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. Because each loan is different, MortgageIT expects and encourages underwriters to use professional judgment based on their experience in making a lending decision. MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

67. The Prospectus Supplement also assured investors that MortgageIT used meaningful checks and balances in underwriting all loans, regardless of the documentation required:

> The mortgage loans have been originated under "full/alternative", "stated income/verified assets", "stated income/stated assets", "no documentation" or "no ratio" programs. The "full/alternative" documentation programs generally verify income and assets in accordance with Fannie Mae/Freddie Mac underwriting requirements. . . . Generally, under a "stated income/verified assets" program, no verification of a mortgagor's income is undertaken by the originator; however, verification of the mortgagor's assets is obtained. Under a "stated income/stated assets" program, the originator undertakes no verification of either a mortgagor's income or a mortgagor's assets, although both income and assets are stated on the loan application and subject to reasonable underwriting approval. Generally, under a "no documentation" program, the mortgagor is not required to state his or her income or assets and therefore, the originator undertakes no verification of such mortgagor's income or assets. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score. Generally, under a "no ratio" program, the mortgagor is not required to disclose their income although the nature of employment is disclosed. Additionally, on a "no ratio" program assets are verified. MortgageIT generally conducts a verbal verification of employment prior to closing.

68.     Additionally, the Prospectus Supplement assured investors that Countrywide underwrote loans based on a borrower's ability to repay and the sufficiency of the collateral:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to income" ratios) are within acceptable limits.

69.     It described the checks and balances Countrywide used in underwriting all loans, regardless of the documentation required:

> In general under the Full Documentation Loan Program (the "Full Documentation Program"), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets and mortgages.
>
> ***
>
> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.
>
> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective

23

borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections.

\*\*\*

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%.

### (5)     Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5

70.     For the Series 2006-AR5 securitization, DB Structured Products split the

mortgage loans backing the securities into two groups.  DB Structured Products purchased

21.11% of the  mortgage loans in the first group (based on total principal balance) from Indymac

Bank, F.S.B ("Indymac"); 20.91% of the mortgage loans from American Home Mortgage Corp.

("American Home"); 17.66% from GreenPoint; and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.  DB Structured Products purchased 31.51% of the mortgage loans in the second group (based on total principal balance) from GreenPoint; and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

71.    The Prospectus Supplement for the Series 2006-AR5 securitization made specific representations about Indymac's, American Home's, and GreenPoint's underwriting standards.

72.    The Prospectus Supplement represented that IndyMac consistently followed underwriting guidelines to originate performing loans, and originated loans that did not meet the guidelines only if compensating factors were present:

> IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and Electronic Mortgage Information and Transaction System ("e-MITS") underwriting.  E-MITS is an automated, internet-based underwriting and risk-based pricing system.  IndyMac Bank believes that e-MITS generally enables it to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional underwriting and also provides consistent underwriting decisions.  IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors.

> IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral.  Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

73.    The Prospectus Supplement also represented that IndyMac allowed reduced documentation only for borrowers with higher credit quality and lower debt:

> In general, documentation types that provide for less than full documentation of employment, income and liquid assets require

higher credit quality and have lower loan-to-value ratios and loan
amount limits.

74.     Additionally, the Prospectus Supplement represented that American Home

employed conservative underwriting guidelines designed to ensure the borrower's ability to

repay the loan:

> American Home's underwriting philosophy is to weigh all risk
> factors inherent in the loan file, giving consideration to the
> individual transaction, borrower profile, the level of documentation
> provided and the property used to collateralize the debt.  These
> standards are applied in accordance with applicable federal and
> state laws and regulations. Exceptions to the underwriting
> standards may be permitted where compensating factors are
> present. . . . Because each loan is different, American Home
> expects and encourages underwriters to use professional judgment
> based on their experience in making a lending decision.
>
> American Home underwrites a borrower's creditworthiness based
> solely on information that American Home believes is indicative of
> the applicant's willingness and ability to pay the debt they would
> be incurring.

75.     The Prospectus Supplement assured investors that loans originated by American

Home were either fully documented or had other compensating factors, such as higher credit

scores or lower loan-to-value ratios:

> Non-conforming loans are generally documented to the
> requirements of Fannie Mae and Freddie Mac, in that the borrower
> provides the same information on the loan application along with
> documentation to verify the accuracy of the information on the
> application such as income, assets, other liabilities, etc.  Certain
> non-conforming stated income or stated asset products allow for
> less verification documentation than Fannie Mae or Freddie Mac
> require. Certain non-conforming Alt-A products also allow for less
> verification documentation than Fannie Mae or Freddie Mac
> require. . . . Alt-A products with less verification documentation
> generally have other compensating factors such as higher credit
> score or lower loan-to-value requirements.

76.     The Prospectus Supplement represented that GreenPoint's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present.

77.     The Prospectus Supplement further provided that Greenpoint calculated borrowers' debt ratios to ensure that borrowers could make their monthly payments:

> In determining whether a prospective mortgagor has sufficient monthly income available to meet the mortgagor's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed mortgagor's monthly gross income. . . . The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's.

78.     To confirm a borrower's ability to repay, the Prospectus Supplement also stated that GreenPoint collected information about the borrower's income:

> As part of its evaluation of potential mortgagors, GreenPoint generally requires a description of the mortgagor's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Employment verification may be obtained through analysis of the prospective mortgagor's recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the mortgagor's most recent two years' tax returns, or from the prospective mortgagor's employer, wherein the employer reports the mortgagor's length of employment and current salary with that organization. Self-employed prospective mortgagors generally are required to submit relevant portions of their federal tax returns for the past two years.

79.     The Prospectus Supplement represented that GreenPoint applied conservative underwriting guidelines even to loans originated under "limited documentation" or "no documentation programs:

> Mortgage loans underwritten under this type of program are generally limited to mortgagors with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion . . . .  Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, . . . [e]mphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective mortgagor, rather than on verified income and assets of the mortgagor. . . .  Mortgage loans underwritten under no documentation programs are generally limited to mortgagors with favorable credit histories and who satisfy other standards for limited documentation programs.

### (6)     Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

80.     For the Series 2006-AR6 securitization, DB Structured Products purchased approximately 36.40% of the mortgage loans backing the securities (based on total principal balance) from MortgageIT; 11.59% of the mortgage loans from Countrywide; and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

81.     The Prospectus Supplement for the Series 2006-AR6 securitization made specific representations about MortgageIT's underwriting standards.

82.     The Prospectus Supplement assured investors that MortgageIT underwrote loans based on a borrower's willingness and ability to repay:

> MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  Because each loan is different, MortgageIT expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.  MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT

believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

83.     The Prospectus Supplement also assured investors that MortgageIT used meaningful checks and balances in underwriting all loans, regardless of the documentation required:

> The mortgage loans have been originated under "full/alternative", "stated income/verified assets", "stated income/stated assets", "no documentation" or "no ratio" programs.  The "full/alternative" documentation programs generally verify income and assets in accordance with Fannie Mae/Freddie Mac underwriting requirements. . . . Generally, under a "stated income/verified assets" program, no verification of a mortgagor's income is undertaken by the originator; however, verification of the mortgagor's assets is obtained.  Under a "stated income/stated assets" program, the originator undertakes no verification of either a mortgagor's income or a mortgagor's assets, although both income and assets are stated on the loan application and subject to reasonable underwriting approval. Generally, under a "no documentation" program, the mortgagor is not required to state his or her income or assets and therefore, the originator undertakes no verification of such mortgagor's income or assets.  The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.  Generally, under a "no ratio" program, the mortgagor is not required to disclose their income although the nature of employment is disclosed.  Additionally, on a "no ratio" program assets are verified.  MortgageIT generally conducts a verbal verification of employment prior to closing.

### (7)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1

84.     For the Series 2007-SL1 securitization, DB Structured Products purchased approximately 21.41% of the mortgage loans backing the securities (based on total principal balance) from American Home; 20.85% of the mortgage loans from Residential Funding Company, LLC ("RFC"); 16.48% of the mortgage loans from Chapel Funding Corporation; and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

85.     The Prospectus Supplement for the Series 2007-SL1 securitization made specific

representations about the originators' general underwriting standards and American Home's and

RFC's underwriting standards.

86.     The Prospectus Supplement represented that:

> The underwriting standards of the Originators are intended to
> assess the ability and willingness of the mortgagor to repay the
> debt and to evaluate the adequacy of the property as collateral for
> the mortgage loan.  The Originators consider, among other things,
> a mortgagor's credit history, repayment ability and debt service-to-
> income ratio, as well as the value, type and use of the mortgaged
> property.

87.     Additionally, the Prospectus Supplement represented that American Home

employed conservative underwriting guidelines designed to ensure the borrower's ability to

repay the loan:

> American Home's underwriting philosophy is to weigh all risk
> factors inherent in the loan file, giving consideration to the
> individual transaction, borrower profile, the level of documentation
> provided and the property used to collateralize the debt.  These
> standards are applied in accordance with applicable federal and
> state laws and regulations. Exceptions to the underwriting
> standards may be permitted where compensating factors are
> present. . . . Because each loan is different, American Home
> expects and encourages underwriters to use professional judgment
> based on their experience in making a lending decision.
>
> American Home underwrites a borrower's creditworthiness based
> solely on information that American Home believes is indicative of
> the applicant's willingness and ability to pay the debt they would
> be incurring.

88.     The Prospectus Supplement assured investors that loans originated by American

Home were either fully documented or had other compensating factors, such as higher credit

scores or lower loan-to-value ratios:

> Non-conforming loans are generally documented to the
> requirements of Fannie Mae and Freddie Mac, in that the borrower
> provides the same information on the loan application along with

> documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. . . . Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

89.     Finally, the Prospectus Supplement represented that RFC issued loans only to

borrowers with good credit:

> Residential Funding Company, LLC's home equity program is designed for borrowers with good credit who may have difficulty obtaining traditional financing due to loan characteristics, such as LTV ratios as high as 100% and second lien status. The underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Company, LLC's Client Guide . . . .

90.     It assured investors that RFC employed underwriting guidelines to ensure that

borrowers could repay their loans:

> The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements.

91.     The Prospectus Supplement represented that, even for reduced documentation

loans, the underwriting standards ensured a borrower's ability to repay:

> Limited documentation programs normally compensate for increased credit risk by placing greater emphasis on either the review of the property to be financed or the borrower's ability to repay the loan. For example, under Residential Funding Company, LLC's stated income limited loan documentation program, some submission requirements regarding income verification and debt-to-income ratios are removed, but the seller is still required to perform a thorough credit underwriting of the loan. Normally, in

31

order to be eligible for a reduced loan documentation program, a
borrower must have a good credit history, and other compensating
factors, including a relatively low combined LTV ratio or other
favorable underwriting factors, must be present.

### (8)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1

92.     For the 2007-ASAP1 securitization, the Prospectus Supplement represented that

the third-party originators had used DB Structured Products' underwriting standards to originate

the mortgage loans backing the securities.

93.     The Prospectus Supplement represented that the underwriting standards were

consistently applied, even for non-conforming loans, to confirm a borrower's ability to repay and

the adequacy of the property as collateral:

> The Sponsor's underwriting standards are primarily intended to
> assess the ability and willingness of a borrower to repay the debt of
> the mortgage loan and to evaluate the adequacy of the related
> mortgaged property as collateral for the mortgage loan. All of the
> Mortgage Loans were underwritten with a view towards resale in
> the secondary mortgage market. In underwriting a mortgage loan,
> the Sponsor considers, among other things, a mortgagor's credit
> history, repayment ability and debt service-to-income ratio
> (referred to in this section of the prospectus supplement as the
> "Debt Ratio"), as well as the value, type and use of the mortgaged
> property.

94.     The Prospectus Supplement also represented that only an "insignificant portion"

of the mortgage loans deviated from the underwriting guidelines, and that those loans had

sufficient compensating factors:

> All of the Mortgage Loans were reviewed by the Sponsor's
> contract underwriters.  On a case by case basis, the Sponsor may
> determine that, based upon compensating factors, a prospective
> borrower who does not strictly qualify under the underwriting risk
> category guidelines described below warrants an underwriting
> exception.  Compensating factors may include, but are not limited
> to, low loan-to-value ratio, low Debt Ratio, substantial liquid
> assets, good credit history, stable employment and time in
> residence at the applicant's current address.  It is expected that an

insignificant portion of the Mortgage Loans may represent such underwriting exceptions.

95.     Finally, the Prospectus Supplement represented that a number of quality control procedures were conducted to ensure adherence to underwriting standards and loan quality:

> The Sponsor conducts a number of quality control procedures, including a full re-underwriting of a random selection of mortgage loans to assure asset quality. Under the asset quality procedure, a random selection of each month's originations is reviewed. The mortgage loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to management for response. The audit findings and management responses are then reviewed by the Sponsor's senior management. Adverse findings are tracked monthly and over a rolling six month period. This review procedure allows the Sponsor to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

**(9)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3**

96.     For the Series 2007-HE3 securitization, DB Structured Products purchased the mortgage loans backing the securities from Residential Mortgage Assistance Enterprise LLC ("ResMAE").

97.     The Prospectus Supplement for the Series 2007-HE3 securitization represented that ResMAE's underwriting standards were consistently applied to ensure a borrower's ability and willingness to repay and the adequacy of the collateral

> The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to income ratio (referred to herein as the Debt Ratio), as well as the value, type and use of the mortgaged property.

98.     The Prospectus Supplement also represented that ResMAE used various methods to verify income, even for stated income loans:

> ResMAE's underwriters verify the income of each applicant under the Full Documentation and Limited Documentation programs. Under Full Documentation, applicants are generally required to submit verification of stable year to date income and the preceding year's income; under Limited Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements. Under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. Under all programs, the income stated must be reasonable and customary for the applicant's line of work; also, a pre-closing audit is conducted to confirm that the borrower is employed as stated on the mortgage application.

99.     Finally, the Prospectus Supplement represented that ResMAE conducted a number of quality control procedures to ensure adherence to underwriting standards and loan quality:

> ResMAE conducts a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of mortgage loans to assure asset quality. Under the compliance audit, all mortgage loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the post-funding quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is provided quarterly to loan production for response. The audit findings and responses are then reviewed by ResMAE's senior management. Adverse findings are tracked monthly and reported quarterly. This review procedure allows ResMAE to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

**(10)    ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2**

100.    For the Series 2007-WM2 securitization, DB Structured Products purchased the mortgage loans backing the securities from WMC Mortgage Corp., ("WMCMC" or "WMC").

101.    The Prospectus Supplement for the Series 2007-WM2 securitization made specific representations about the originators' general underwriting standards and ResMAE's underwriting standards.

102.    The Prospectus Supplement represented that underwriting standards were consistently applied, even for non-conforming loans, to confirm a borrower's credit profile and produce performing loans:

> The underwriting standards of the Originator are intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the property as collateral for the mortgage loan. The Originator considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property.

103.    The Prospectus Supplement also represented that WMC consistently verified a borrower's income for ability to repay:

> Under the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines.

104.    The Prospectus Supplement represented that WMC conducted credit checks and verifications of income, even for stated income loans:

> The Underwriting Guidelines require that the documentation accompanying each mortgage loan application include, among other things, a tri-merge credit report on the related applicant from a credit reporting company aggregator.  The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments.  In most instances, WMC obtains a tri-merge credit score independent from the mortgage loan application from a credit reporting company aggregator. . . . In the case of mortgage loans originated under the Stated Income Documentation and

> Stated Income/Verified Assets (Streamlined) Documentation
> categories, the Underwriting Guidelines require (1) that income be
> stated on the application, accompanied by proof of self
> employment in the case of self-employed individuals, (2) that a
> WMC pre-funding auditor conduct telephonic verification of
> employment, or in the case of self-employed individuals,
> telephonic verification of business line and (3) that stated income
> be consistent with type of work listed on the application.

### (11)   ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4

105.   For the Series 2007-HE4 securitization, DB Structured Products purchased

approximately 61.37% of the mortgage loans backing the securities (based on total principal

balance) from DB Home Lending LLC (formerly known as Chapel Funding, LLC) ("DB

Home"); 12.18% of the mortgage loans from ResMAE; and the remaining mortgage loans from

various originators, each of which originated less than 10% of the loans.

106.   The Prospectus Supplement for the Series 2007-HE4 securitization represented

that DB Home's underwriting standards were consistently applied to confirm a borrower's ability

to repay and the adequacy of the collateral:

> DB Home's guidelines are primarily intended to (1) determine that
> the borrower has the ability to repay the mortgage loan in
> accordance with its terms and (2) determine that the related
> mortgaged property will provide sufficient value to recover the
> investment if the borrower defaults. The underwriting of a
> mortgage loan to be originated or purchased by DB Home
> generally includes a review of the completed loan package, which
> includes the loan application, a current appraisal, a preliminary
> title report and a credit report. All loan applications and all closed
> loans offered to DB Home for purchase must be approved by DB
> Home in accordance with its underwriting criteria. DB Home
> regularly reviews its underwriting guidelines and makes changes
> when appropriate to respond to market conditions, the performance
> of loans representing a particular loan product and changes in laws
> or regulations.

107.   The Prospectus Supplement further represented that DB Home's underwriting

guidelines generated "quality loans":

DB Home underwrites each mortgage loan that it originates in accordance with its internal underwriting guidelines. DB Home has developed internal underwriting processes and criteria that it believes generate quality loans and give it the ability to approve and fund loans quickly. DB Home's internal underwriting guidelines are designed to help it evaluate a borrower's credit history, capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral.

108.    The Prospectus Supplement promised that an insubstantial number of loans would be granted under exceptions if sufficient compensating factors existed:

Although DB Home generally does not make adjustments to the credit category of any applicant, DB Home may determine on a case-by-case basis that an applicant warrants a LTV ratio exception, a loan amount exception, a debt-to-income exception or another exception. DB Home may allow such an exception if the application reflects certain compensating factors, such as a lower than the maximum LTV ratio for the specific loan program, a maximum of one 30-day late payment on all mortgage loans during the last 12 months, job and income stability or a meaningful amount of liquid assets. DB Home may also grant an exception if the applicant provides a down payment of at least 20% of the purchase price of the underlying property or if the new mortgage loan significantly reduces the applicant's aggregate monthly debt service payments. DB Home expects that not a substantial number of the mortgage loans they originate will represent such underwriting exceptions.

109.    The Prospectus Supplement assured investors that any exceptions to its underwriting guidelines were approved only by an Underwriting Manager or higher:

If an individual loan application does not meet DB Home's formal written underwriting guidelines, but the underwriter is confident both that the borrower has the ability and willingness to pay and that the property provides adequate collateral for the borrower's obligations, DB Home's underwriters cannot make underwriting exceptions.  Any of DB Home's loan programs which have an exception can only be approved by the Underwriting Manager or higher, regardless of the exception, such as LTV ratio exceptions, loan amount exceptions, and debt-to-income.

110.    Finally, the Prospectus Supplement touted DB Home's "quality control":

DB Home's quality control program is intended to monitor loan production with the overall goal of improving the quality of loan production generated by its independent mortgage broker channel. Through systematically monitoring loan production, the quality control department can identify and communicate to management existing or potential underwriting and loan packaging problems or other areas of concern. The quality control file review ensures compliance with DB Home's underwriting guidelines and federal and state regulations. This is accomplished by focusing on:

• the accuracy of all credit and legal information;

• a collateral analysis, which may include a desk or field re-appraisal of the property and review of the original appraisal;

• employment and/or income verification; and

• legal document review to ensure that the necessary documents are in place.

**B.      The DB Defendants' Disregard of Underwriting Standards to Generate a Large Volume of Loans for Securitization and Sale to Investors**

111.    The securitization process incentivized the DB Defendants to disregard or abandon underwriting standards so that they could purchase huge volumes of low-quality loans to securitize.

112.    As the private residential mortgage-backed securities market expanded, the traditional "originate to hold" model morphed into the "originate to distribute" model.  Under the "originate to distribute" model, mortgage companies, such as the DB Defendants, no longer held the mortgage loans to maturity.  Rather, they purported to shift the risk of loss to the investors who purchased an interest in the securitized pool of loans.

113.    The new distribution model was highly profitable for the DB Defendants and other mortgage companies.  By securitizing and selling mortgage loans to investors through underwriters, mortgage companies received immediate payment for the loans, shifted the loans off their books, and were able to purchase more loans.  The securitization process enabled the

mortgage companies to earn most of their income from transaction and loan-servicing fees.

Because the mortgage companies were seeking to transfer the risk of loss, they had an unchecked

incentive to purchase more and more loans to feed into the securitization machine.

114.    The Attorney General for the Commonwealth of Massachusetts explained this

unchecked incentive in her investigation into the subprime mortgage industry:

> Historically, the vast majority of home mortgages were written by banks
> which held the loans in their own portfolios, knew their borrowers, and
> earned profit by writing good loans and collecting interest over many
> years.  Those banks had to live with their "bad paper" and thus had a
> strong incentive to avoid making bad loans.  In recent years, however, the
> mortgage market has been driven and funded by the sale and securitization
> of the vast majority of loans.  Lenders now frequently make mortgage
> loans with the intention to promptly sell the loan and mortgage to one or
> more entities. . . . The lenders' incentives thus changed from writing good
> loans to writing a huge volume of loans to re-sell, extracting their profit at
> the front end, with considerably less regard to the ultimate performance of
> the loans.

115.    Ben Bernanke, Chairman of the Federal Reserve Bank, also explained the

incentive to abandon underwriting standards in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on
> the terms of the sale, much or all of the risks are passed on to the loan
> purchaser.  Thus, originators who sell loans may have less incentive to
> undertake careful underwriting than if they kept the loans. Moreover, for
> some originators, fees tied to loan volume made loan sales a higher
> priority than loan quality.  This misalignment of incentives, together with
> strong investor demand for securities with high yields, contributed to the
> weakening of underwriting standards.

116.    To take advantage of the exploding market for residential mortgage-backed

securities, the DB Defendants disregarded or abandoned underwriting standards and failed to

conduct adequate due diligence so that they could originate and purchase as many loans as

possible for securitization.

117.    Unbeknownst to MassMutual, the DB Defendants purchased loans that had been

issued to borrowers regardless of their ability to pay.  The loans were often issued on the basis of

overstated incomes, inflated appraisals, false verifications of employment, or exceptions to underwriting criteria that had no proper justification.  The origination practices engaged in by the originators from which the DB Defendants purchased loans were in blatant disregard of the disclosed underwriting standards, and any semblance of reasonable and prudent underwriting.

118.    The DB Defendants' disregard of underwriting guidelines has been the subject of multiple investigations and lawsuits.  For example, in the case *Assured Guaranty Corp. v. DB Structured Products, Inc.*, No. 651824-2010 (NY State Supreme Court), Assured states that it obtained and examined mortgage loans for two DB transactions conducted in 2007.  Assured found that out of 1,306 defaulted loans in one transaction, "no fewer than 1,084 loans, or more than 83% of the loans examined" breached underwriting representations and warranties.  Assured also found that out of 1,774 defaulted loans in the other transaction, "1,532 loans, or more than 86% of the loans examined" breached underwriting representations and warranties. Similarly, in *Massachusetts Bricklayers & Masons Funds v. Deutsche Alt-A Sec.*, No. 08-cv-3178 (E.D.N.Y. 2008), the plaintiff pension fund alleges violations of underwriting standards and misrepresentations relating to underwriting standards by the DB Defendants in the Offering Materials for two DB-sponsored securitizations, including one at issue here – Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5.  The plaintiff in the *Massachusetts Bricklayers* case reviewed documentation for 58 loans backing the Series 2006-AR5 securitization, including information from borrowers that has been made publicly available pursuant to bankruptcy proceedings or other records, and found that 41 of the 58 loans (or 71%) had no apparent determination as to whether the borrower could afford to repay his or her loan occurred, contrary to the representations in the Offering Materials.

C.   **Widespread Defaults That Confirm the DB Defendants' Disregard of Underwriting Standards**

119.   Even though the Certificates purchased by MassMutual were supposed to be long-term, stable investments, just years after their issuance, a substantially high percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders, including MassMutual.  The following table contains the most recent performance data available for the loan pools:

| Transaction | Number of Loans in Pool at Closing | Current Number of Loans in Pool | Number of Loans Liquidated or Foreclosed Upon | Number of Loans in Default or Delinquent | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|
| Deutsche Alt-A 2006-AF1 | 3602 | 984 | 1095 | 140 | 34.29% |
| Deutsche Alt-A 2006-AR2 | 1903 | 525 | 485 | 31 | 27.12% |
| ACE 2006-ASAP4 | 3656 | 1002 | 1078 | 116 | 32.66% |
| Deutsche Alt-A 2006-AR3 | 3891 | 1647 | 424 | 639 | 27.32% |
| Deutsche Alt-A 2006-AR5 | 5488 | 1542 | 2268 | 208 | 45.12% |
| Deutsche Alt-A 2006-AR6 | 5559 | 2889 | 815 | 1383 | 39.54% |
| ACE 2007-SL1 | 6519 | 1555 | 2733 | 123 | 43.81% |
| ACE 2007-ASAP1 | 4657 | 1638 | 1814 | 191 | 43.05% |
| ACE 2007-HE3 | 3386 | 702 | 2124 | 158 | 67.40% |
| ACE 2007-WM2 | 4048 | 1313 | 2150 | 155 | 56.94% |
| ACE 2007-HE4 | 4755 | 889 | 2996 | 79 | 64.67% |

120.   Many of MassMutual's investments initially received the highest possible Standard & Poor's rating—AAA—which has historically represented an expected loss rate of less than .05%.  This is the same rating typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills.  According to S&P's whitepaper, "Understanding Standard & Poor's Rating Definitions," a AAA rating represents an "extremely strong capacity to meet its financial commitments."

121.    Because of the high delinquency and default rates, among other things, however, most of the Certificates have been downgraded to junk-bond ratings, as can be seen in the following table:

| Certificate | Original S&P Rating | Current S&P Rating | Original Moody's Rating | Current Moody's Rating |
|---|---|---|---|---|
| Deutsche Alt-A 2006-AF1, Class 1A4 | AAA | CCC | Aaa | Ca |
| Deutsche Alt-A 2006-AF1, Class A3 | AAA | CCC | Aaa | Caa1 |
| Deutsche Alt-A 2006-AR2, Class 1A2 | AAA | CC | Aaa | Caa3 |
| ACE 2006-ASAP4, Class M8 | A | No Longer Rated[1] | Baa2 | No Longer Rated |
| Deutsche Alt-A 2006-AR3, Class A1 | AAA | D | Aaa | Ca |
| Deutsche Alt-A 2006-AR5, Class M8 | BBB+ | No Longer Rated | Baa2 | No Longer Rated |
| Deutsche Alt-A 2006-AR5, Class M9 | BBB+ | No Longer Rated | Baa3 | No Longer Rated |
| Deutsche Alt-A 2006-AR6, Class M8 | A- | No Longer Rated | Baa2 | No Longer Rated |
| ACE 2007-SL1, Class A2 | AAA | AA+ | Aaa | C |
| ACE 2007-ASAP1, Class A2D | AAA | CCC | Aaa | Ca |
| ACE 2007-HE3, Class A2C | AAA | CCC | Aaa | C |
| ACE 2007-WM2, Class A2C | AAA | CCC | Aaa | Ca |
| ACE 2007-HE4, Class A2C | AAA | CCC | Aaa | Ca |

122.    The poor performance of the loan pools and the rapidly dropping credit ratings of the Certificates have caused a massive decline in the market values of the Certificates. According to the most recent data, the Certificates should be worth approximately $99 million, but their market value is substantially lower – approximately $43 million.

123.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools.  Loan pools that were properly underwritten and contained loans with the represented characteristics would have

---

[1]   Each bond designated as "No Longer Rated" has been written off entirely due to losses.

experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

## V.     MISREPRESENTATIONS ABOUT APPRAISALS AND LOAN-TO-VALUE RATIOS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.     Appraisal and LTV Testing

124.    MassMutual commissioned a forensic review of the mortgage loans underlying the Certificates to determine whether the characteristics of the mortgage loans, as represented in the Offering Materials, were accurate.

125.    As part of the forensic review, data relating to the collateral loans underlying each of the securitizations was gathered from multiple public sources, including assessor, DMV, credit, and tax records, as well as proprietary sources such as loan servicing, securitization, and mortgage application records.  The data relating to individual mortgage loans was then compared to the representations made in the Offering Materials.

126.    The forensic review tested the appraised values and loan-to-value ratio ("LTV") of each property, as represented in the Offering Materials, through an industry-standard automated valuation model ("AVM").

127.    The LTV is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  This ratio was material to MassMutual and other investors because higher ratios are correlated with a higher risk of default.  A borrower with a small equity position in a property has less to lose if he or she defaults on the loan.  There is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property.  LTV is a common metric for analysts and investors to evaluate the price and risk of mortgage-backed securities.

128.    For each of the loans reviewed, the underlying property was valued by an industry-standard AVM.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  AVMs have become ubiquitous enough that their testing and use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act.  AVMs rely upon similar data as in-person appraisals— primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.  The AVM that MassMutual used incorporates a database of 500 million mortgage transactions covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States.  Independent testing services have determined that this AVM is the most accurate of all such models.

129.    For purposes of MassMutual's forensic review, a retrospective AVM was conducted for each loan to calculate the value of the underlying property at the time each loan was originated.  The inputs for each calculation included, *inter alia*, (1) any subsequent sale prices of the target property, (2) sale prices and appraisals of comparable properties in the neighborhood, and (3) changes in home price indices over time.

130.    Applying the AVM results to the available data for the loans underlying the Certificates shows that the appraised values given to the properties were often significantly higher than what the properties were actually worth.  This affected the LTV ratios by decreasing the actual value of the properties relative to the loan amounts, which increased the overall ratios.  This overvaluation affected numerous statistics in the Offering Materials, as described in detail for each transaction in the next section (Section V.B).

**B.**    **Specific Misrepresentations in the Offering Materials.**

**(1)    Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1**

131.    The Prospectus Supplement for the Series 2006-AF1 securitization represented that the weighted average LTV ratio of the mortgage loans was 77.77%. It also represented that only 259 mortgage loans would have an LTV above 90%, which was 5.81% of the collateral pool.

132.    Additionally, the Offering Materials represented that GreenPoint, which originated 23.39% of the Mortgage Loans, obtained independent appraisals for those Mortgage Loans. The Prospectus Supplement for Series 2006-AF1 represented as follows:

> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

133.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false. The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart
below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 77.77% | 83.97% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 5.81% (259 loans)[2] | 19.25% (693 loans) |

134.    In total, 35% of the loans tested were shown to have appraisals that were inflated
by 10% or more, and 26% of the loans tested had LTVs that were 10 or more percentage points
less than was represented.  These results not only demonstrate that the loan statistics in the
Offering Materials were false, but also that the representations relating to appraisal practices
were false.  Independent appraisers following proper practices would not systematically generate
appraisals that deviate so significantly from the true values of the appraised properties.

135.    The DB Defendants had full access to the appraisal records and all data relating to
the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the
accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in
originating and securitizing the loans and conducting due diligence, they knew that the
estimations of the properties' values bore no relationship to the actual data and characteristics of
the properties.  They knew that the estimations of the properties' values were not justified, were
unreasonable, and were inaccurate.

---

[2]   The percentage shown is based on the total outstanding principal balance of the loans.

### (2)     Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2

136.     The Prospectus Supplement for the Series 2006-AR2 securitization represented that the weighted average LTV ratio of the mortgage loans was 76.43%.  It also represented that only 52 mortgage loans would have an LTV above 90%, which was 2.67% of the collateral pool.

137.     Additionally, the Offering Materials represented that OSB, which originated 32.71% of the Mortgage Loans, obtained independent appraisals for those Mortgage Loans.  The Prospectus Supplement for Series 2006-AR2  represented as follows:

> With respect to loans sold to DB Structured Products, Inc., in order to determine the marketability of a property, an independent property valuation must be obtained from a licensed appraiser. OSB's underwriting guidelines require that the value of the mortgaged property being financed, as indicated by the independent valuation, currently supports and is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values, although there can be no assurance that such value will support the outstanding loan balance in the future.  The loan-to-value (LTV) is based upon the lesser of the sales price, if applicable, or the appraisal. Eligible properties include 1-4 family, attached and detached condominiums, planned unit developments, and manufactured homes for use as the prospective borrower's primary residence, second home, or investment property. Generally, for loans of $1,000,000 or more, two appraisals may be required from two different appraisers.

138.     Similarly, the Prospectus Supplement stated that GreenPoint, which originated 20.44% of the Mortgage Loans, obtained independent appraisals for those Mortgage Loans:

> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing.  All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that

construction, if new, has been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines.  In certain cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.  GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

139.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 76.43% | 87.23% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 2.67% (52 loans) | 20.48% (391 loans) |

140.    In total, 33% of the loans tested had LTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

141.    The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

### (3)    ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4

142.    The Prospectus Supplement for the Series 2006-ASAP4 securitization represented that the weighted average CLTV ratio of the mortgage loans was 81.38%.  It also represented that only 974 mortgage loans would have an CLTV above 90%, which was 11.6% of the collateral pool.

143.    The Prospectus Supplement for the Series 2006-ASAP4 securitization also represented that appraisals would be performed in accordance with Freddie Mac or Fannie Mae standards:

> The Sponsor's guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards and, if appropriate, a review appraisal.  Generally, appraisals are provided by an approved list of appraisers maintained by the Sponsor.  Additionally, review appraisals may only be provided by appraisers other than the original appraiser approved by the Sponsor.  In some cases, the Sponsor relies on a statistical appraisal methodology provided by a third-party.  Each review appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

144.     These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the CLTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average CLTV of the Collateral Loans | 81.38% | 103.78% |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 11.6% (974 loans) | 77.81% (2,876 loans) |

145.     In total, 30% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 32% of the loans tested had CLTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

146.     The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of

50

the properties.  They knew that the estimations of the properties' values were not justified, were

unreasonable, and were inaccurate.

### (4)  Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3

147.  The Prospectus Supplement for the Series 2006-AR3 securitization represented

that the weighted average LTV ratio of the mortgage loans was 76.12%.  It also represented that

only 21 mortgage loans would have an LTV above 90%, which was 0.36% of the collateral pool.

148.  Additionally, the Offering Materials represented that Countrywide, which

originated 19.10% of the Mortgage Loans, obtained independent appraisals for those Mortgage

Loans.  The Prospectus Supplement for the Series 2006-AR3 represented as follows:

> Except with respect to the mortgage loans originated pursuant to its
> Streamlined Documentation Program, whose values were
> confirmed with a Fannie Mae proprietary automated valuation
> model, Countrywide Home Loans obtains appraisals from
> independent appraisers or appraisal services for properties that are
> to secure mortgage loans.  The appraisers inspect and appraise the
> proposed mortgaged property and verify that the property is in
> acceptable condition.  Following each appraisal, the appraiser
> prepares a report which includes a market data analysis based on
> recent sales of comparable homes in the area and, when deemed
> appropriate, a replacement cost analysis based on the current cost
> of constructing a similar home.  All appraisals are required to
> conform to Fannie Mae or Freddie Mac appraisal standards then in
> effect.

149.  The Prospectus Supplement also stated that MortgageIT, which originated

44.70% of the Mortgage Loans, employed the following procedures with respect those Mortgage

Loans:

> Every MortgageIT mortgage loan is secured by a property that has
> been appraised by a licensed appraiser in accordance with the
> Uniform Standards of Professional Appraisal Practice of the
> Appraisal Foundation.  The appraisers perform on site inspections
> of the property and report on the neighborhood and property
> condition in factual and specific terms.  Loans in excess of one
> million dollars require (i) two full appraisals or (ii) one full
> appraisal and a field review, ordered by a MortgageIT-approved

national appraiser, including photographs of the interior and the exterior of the subject property.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, a MortgageIT underwriter or a mortgage insurance company contract underwriter reviews each appraisal for accuracy and consistency.

150.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 76.12% | 85.45% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 0.36% (21 loans) | 19.81% (722 loans) |

151.    In total, 42% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 34% of the loans tested had LTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

152.    The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the

accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in

originating and securitizing the loans and conducting due diligence, they knew that the

estimations of the properties' values bore no relationship to the actual data and characteristics of

the properties.  They knew that the estimations of the properties' values were not justified, were

unreasonable, and were inaccurate.

**(5)     Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5**

153.     The Prospectus Supplement for the Series 2006-AR5 securitization represented

that the weighted average LTV ratio of the Group I mortgage loans was 76.52%.  It also

represented that only 82 of the Group I mortgage loans would have an LTV above 90%, which

was 1.39% of the Group I collateral pool.

154.     The Prospectus Supplement for the Series 2006-AR5 securitization represented

that the weighted average LTV ratio of the Group II-1 mortgage loans was 67.77%.  It also

represented that only 3 Group II-1 mortgage loans would have an LTV above 90%, which was

1.38% of the Group II-1 collateral pool.

155.     The Prospectus Supplement for the Series 2006-AR5 securitization represented

that the weighted average LTV ratio of the Group II-2 mortgage loans was 63.24%.  It also

represented that only 2 Group II-2 mortgage loans would have an LTV above 90%, which was

0.78% of the Group II-2 collateral pool.

156.     The Prospectus Supplement for the Series 2006-AR5 securitization represented

that the weighted average LTV ratio of the Group II-3 mortgage loans was 67.97%.  It also

represented that only 5 Group II-3 mortgage loans would have an LTV above 90%, which was

0.47% of the Group II-3 collateral pool.

157.     Additionally, the Offering Materials represented that GreenPoint, which

originated 17.66% of the Group I and 31.51% of the Group II Mortgage Loans, obtained

independent appraisals for those loans.  The Prospectus Supplement for the Series 2006-AR5

securitization represented as follows:

> In determining the adequacy of the property as collateral, an
> independent appraisal is generally made of each property
> considered for financing.  All appraisals are required to conform
> the Uniform Standards of Professional Appraisal Practice adopted
> by the Appraisal Standard Board of the Appraisal Foundation.
> Each appraisal must meet the requirements of Fannie Mae and
> Freddie Mac.  The requirements of Fannie Mae and Freddie Mac
> require, among other things, that the appraiser, or its agent on its
> behalf, personally inspect the property inside and out, verify
> whether the property is in a good condition and verify that
> construction, if new, has been substantially completed.  The
> appraisal generally will have been based on prices obtained on
> recent sales of comparable properties determined in accordance
> with Fannie Mae and Freddie Mac guidelines.  In certain cases, an
> analysis based on income generated by the property or a
> replacement cost analysis based on the current cost of constructing
> or purchasing a similar property may be used.  GreenPoint's
> Underwriting Guidelines require that the underwriters be satisfied
> that the value of the property being financed supports, and will
> continue to support, the outstanding loan balance, and provides
> sufficient value to mitigate the effects of adverse shifts in real
> estate values.

158.    The Prospectus Supplement also stated that American Home, which originated

20.91% of the Group I Mortgage Loans, employed the following practices with respect to

appraisals:

> Every mortgage loan is secured by a property that has been
> appraised by a licensed appraiser in accordance with the Uniform
> Standards of Professional Appraisal Practice of the Appraisal
> Foundation. The appraisers perform on-site inspections of the
> property and report on the neighborhood and property condition in
> factual and specific terms. Each appraisal contains an opinion of
> value that represents the appraiser's professional conclusion based
> on market data of sales of comparable properties and a logical
> analysis with adjustments for differences between the comparable
> sales and the subject property and the appraiser's judgment. In
> addition, each appraisal is reviewed for accuracy and consistency
> by American Home's vendor management company or an
> underwriter of American Home or a mortgage insurance company
> contract underwriter.

159.     Similarly, the Prospectus Supplement represented that IndyMac, which originated 21.11% of the Group I Mortgage Loans, employed the following practices with respect to appraisals:

> To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice.  The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form.  In some cases, an automated valuation model ("AVM") may be used in lieu of an appraisal.  AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property.  The value of the property, as indicated by the appraisal or AVM, must support the loan amount.

160.     These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

### Group 1 Mortgage Loans

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 76.52% | 85.45% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.39% (82 loans) | 20.74% (886 loans) |

### Group II-1 Mortgage Loans

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 67.77% | 75.96% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.38% (3 loans) | 8.71% (18 loans) |

### Group II-2 Mortgage Loans

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 63.24% | 69.36% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 0.78% (2 loans) | 8.38% (10 loans) |

### Group II-3 Mortgage Loans

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 67.97% | 75.45% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 0.47% (5 loans) | 7.12% (20 loans) |

161.     In total, 33% of the Group I loans, 30% of the Group II-1 loans, 37% of the Group II-2 loans, and 41% of the Group II-3 loans tested were shown to have appraisals that were inflated by 10% or more.  Further, 30% of the Group I loans, 19% of the Group II-1 loans, 19% of the Group II-2 loans, and 29% of the Group II-3 loans tested had LTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

162.     The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

### (6)     Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

163.     The Prospectus Supplement for the Series 2006-AR6 securitization represented that the weighted average LTV ratio of the mortgage loans was 76.52%.  It also represented that only 150 mortgage loans would have an LTV above 90%, which was 2.05% of the collateral pool.

164.     Additionally, the Prospectus Supplement for the Series 2006-AR6 securitization represented that MortgageIT, which originated 36.40% of the Mortgage Loans, employed stringent appraisal practices:

Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Loans in excess of one million dollars require (i) two full appraisals or (ii) one full appraisal and a field review, ordered by a MortgageIT approved national appraiser, including photographs of the interior and the exterior of the subject property.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, a MortgageIT underwriter or a mortgage insurance company contract underwriter reviews each appraisal for accuracy and consistency.

165.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 76.52% | 26.12% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 2.05% (150 loans) | 23.41% (1,221 loans) |

166.    In total, 37% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 32% of the loans tested had LTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices

58

were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

167.    The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

### (7)    ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1

168.    The Prospectus Supplement for the Series 2007-SL1 securitization represented that the weighted average CLTV ratio of the mortgage loans was 96.48%.  It also represented that 5,251  mortgage loans would have an CLTV above 90%, which was 83.3% of the collateral pool.

169.    Additionally, the Offering Materials represented that American Home, which originated 21.41% of the mortgage loans, conducted appraisals in accordance with the Uniform Standards of Professional Appraisal Practice:

> Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.

170.    The Offering Materials also represented that RFC, which originated 20.85% of the mortgage loans, employed the following practices with respect to appraisals:

> Appraisals may be performed by appraisers independent from or affiliated with the depositor, Residential Funding Company, LLC

59

or their affiliates.  The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed.  In some circumstances, the appraiser is only required to perform an exterior inspection of the property.  The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements. Each appraisal is required to be dated no more than 360 days prior to the date of origination of the loan; provided that, depending on the original principal balance, an earlier appraisal may be used if the appraisal was made not earlier than two years prior to the date of origination of the loan and the related appraiser certifies that the value of the related mortgaged property has not declined since the date of the original appraisal or if a field review or statistical valuation is obtained.

171.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the CLTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 96.48% | 110.98% |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 83.3% (5,251 loans) | 86.14% (5,425 loans) |

172.    In total, 37% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 42% of the loans tested had CLTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices

were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

173.    The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

### (8)    ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1

174.    The Prospectus Supplement for the Series 2007-ASAP1 securitization represented that the weighted average CLTV ratio of the mortgage loans was 83.14%.  It also represented that only 1,829 mortgage loans would have an CLTV above 90%, which was 25.07% of the collateral pool.

175.    Additionally, the Prospectus Supplement for the Series 2007-ASAP1 Securitization represented that appraisals were conducted in accordance with Freddie Mac or Fannie Mae standards:

> The Sponsor's guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards and, if appropriate, a review appraisal.  Generally, appraisals are provided by an approved list of appraisers maintained by the Sponsor. Additionally, review appraisals may only be provided by appraisers other than the original appraiser approved by the Sponsor.  In some cases, the Sponsor relies on a statistical appraisal methodology provided by a third-party.

176.     These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the CLTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 83.14% | 103.73% |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 25.07% (1,829 loans) | 66.79% (3,418 loans) |

177.     In total, 37% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 39% of the loans tested had CLTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

178.     The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of

the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

### (9)　ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3

179.　The Prospectus Supplement for the Series 2007-HE3 securitization represented that the weighted average CLTV ratio of the mortgage loans was 83.15%.  It also represented that only 1,209 mortgage loans would have an CLTV above 90%, which was 16.39% of the collateral pool.

180.　Additionally, the Offering Materials represented that independent appraisals were obtained for the mortgage loans.  The Prospectus Supplement for the Series 2007-HE3 securitizations represented as follows:

> The underwriting guidelines of ResMAE are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards, and if appropriate, a review appraisal.  Generally, appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by the Originator. In most cases, ResMAE relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required in order to become approved to do business with ResMAE.  Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

181.　These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 83.15% | 104.54% |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 16.39% (1,209 loans) | 61.64% (2,407 loans) |

182.    In total, 45% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 47% of the loans tested had CLTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

183.    The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

**(10)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2**

184.     The Prospectus Supplement for the Series 2007-WM2 securitization represented that the weighted average CLTV ratio of the mortgage loans was 81.80%.  It also represented that only 1,535 mortgage loans would have an CLTV above 90%, which was 16.16% of the collateral pool.

185.     Additionally, the Prospectus Supplement for the Series 2007-WM2 securitization represented that appraisals were conducted in accordance with the Uniform Standards of Professional Appraisal Practice and then audited for compliance with those standards:

> The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.

186.     These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the CLTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 81.80% | 105.06% |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 16.16% (1,535 loans) | 71.1% (3,230 loans) |

187.    In total, 42% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 43% of the loans tested had CLTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

188.    The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

### (11)    ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4

189.    The Prospectus Supplement for the Series 2007-HE4 securitization represented that the weighted average CLTV ratio of the mortgage loans was 82.83%.  It also represented that only 1,515 mortgage loans would have an CLTV above 90%, which was 18.78% of the collateral pool.

190.    Additionally, the Prospectus Supplement for the Series 2007-HE4 securitization represented that appraisals were consistently subject to stringent review procedures to ensure accuracy:

> An assessment of the adequacy of the real property as collateral for the loan is primarily based upon an appraisal of the property and a calculation of the LTV ratio of the loan applied for and the combined LTV to the appraised value of the property at the time of

66

origination.  Appraisers determine a property's value by reference to the sales prices of comparable properties recently sold, adjusted to reflect the condition of the property as determined through inspection.  As lenders that generally specialize in loans made to credit impaired borrowers, DB Home has implemented an appraisal review process to support the value used to determine the LTV ratio.  DB Home uses a variety of steps in its appraisal review process in order to attempt to ensure the accuracy of the value provided by the initial appraiser. DB Home's review process requires a written review on every appraisal report by the on-site staff appraisers.  As part of their review process, the review department where available, verifies the subject property's sales history, those of comparable properties as well as reviews additional comparable data.  In some cases the value of the property used to determine the LTV ratio is reduced where it has been determined by DB Home's staff appraisers that the original appraised value cannot be supported.

191.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the CLTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 82.83% | 105.84% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 18.78% (1,515 loans) | 60.13% (3,066 loans) |

192.    In total, 51% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 53% of the loans tested had CLTVs that were 10 or more percentage points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices

67

were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

193.     The DB Defendants had full access to the appraisal records and all data relating to the collateral loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They knew that the estimations of the properties' values were not justified, were unreasonable, and were inaccurate.

## VI.     MISREPRESENTATIONS ABOUT OWNER-OCCUPANCY STATISTICS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.     Owner-Occupancy Testing

194.     The forensic review commissioned by MassMutual also tested the accuracy of the representations of owner occupancy in the Offering Materials.

195.     Owner-occupancy statistics were material to MassMutual and other investors because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or investment properties.  Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or second homes and live elsewhere.

196.     MassMutual's forensic review tested the accuracy of the representations of owner occupancy in the Offering Materials.  To determine whether a given borrower actually occupied the property as claimed, MassMutual investigated tax information for the loans.  One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take applicable tax exemptions available to residents of that property.  If a borrower had

his or her tax records sent to another address, that is evidence that that borrower was not actually residing at the mortgaged property.  If a borrower declined to make certain tax exemption elections that depend on the borrower living at the property, that also is evidence the borrower was living elsewhere.  MassMutual also reviewed: (1) borrower credit records, because one would expect that people have bills sent to their primary address.  If a borrower was telling creditors to send bills to another address, even six months after buying the property, that is evidence the borrower was living elsewhere; (2) property records, because it is unlikely that a borrower lives in any one property if in fact that borrower owns multiple properties.  It is even more unlikely that the borrower resides at the mortgaged property if a concurrently owned separate property did not have its own tax bills sent to the property included in the mortgage pool; and (3) records of other liens, because if the property was subject to additional liens but those materials were sent elsewhere, that is evidence the borrower was not living at the mortgaged property.  If the other lien involved a conflicting declaration of residency, that too would be evidence that the borrower did not live in the subject property .

197.    If a property fails more than one of the above tests, that is strong evidence the borrower did not in fact reside at the mortgaged property.  As described more fully in the next section (Section VI.B), the results of MassMutual's loan-level analysis of true owner-occupancy rates on the mortgage loans underlying its Certificates show that, despite the prospectus representations, a much higher percentage of borrowers did not occupy the mortgaged properties than was represented.

**B.** **Specific Misrepresentations in the Offering Materials.**

    **(1)** **Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1**

198.     The Offering Materials for the Series 2006-AF1 securitization represented that 2,340 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 12.31% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 2,340 loans being owner occupied, as represented in the Offering Materials, only 2,052 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 2,340 loans (64.96%)[3] | 2,052 loans (56.98%) |

    **(2)** **Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2**

199.     The Offering Materials for the Series 2006-AR2 securitization represented that 785 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 8.55% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 785 of the loans being owner occupied, as represented in the Offering Materials, only 671 were:

---

[3]   The percentage shown is based on the total number of loans.

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 785 loans (41.14%) | 671 loans (35.18%) |

### (3) Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR3

200. The Offering Materials for the Series 2006-AR3 securitization represented that 3,110 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 12.35% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 3,110 of the loans being owner occupied, as represented in the Offering Materials, only 2,726 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3,110 loans (80.03%) | 2,726 loans (70.06%) |

### (4) Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR5

201. The Offering Materials for the Series 2006-AR5 securitization represented that 3,339 of the Group I Mortgage Loans were for primary residences, i.e. owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 14.50% of the Group I Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus,

as shown in the chart below, instead of 3,339 loans being owner occupied, as represented in the Offering Materials, only 2,855 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3,339 loans (69.93%) | 2,855 loans (59.79%) |

202.    The Offering Materials for the Series 2006-AR5 securitization represented that 350 of the Group II Mortgage Loans were for primary residences, i.e. owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 15.14% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 350 loans being owner occupied, as represented in the Offering Materials, only 297 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 350 loans (49.09%) | 297 loans (41.65%) |

### (5)    Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR6

203.    The Offering Materials for the Series 2006-AR6 securitization represented that 4,276 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 15.06% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown in the chart

below, instead of 4,276 of the loans being owner occupied, as represented in the Offering

Materials, only 3,632 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 4,276 loans (76.84%) | 3,632 loans (65.34%) |

**(6)     ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4**

204.    The Offering Materials for the Series 2006-ASAP4 securitization represented that

3,567 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In

MassMutual's subsequent loan-level analysis, however, 11.66% of the Mortgage Loans reported

to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart

below, instead of 3,567 of the loans being owner occupied, as represented in the Offering

Materials, only 3,151 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3,567 loans (97.57%) | 3,151 loans (86.19%) |

**(7)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1**

205.    The Offering Materials for the Series 2007-ASAP1 securitization represented that

4,533 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In

MassMutual's subsequent loan-level analysis, however, 11.45% of the Mortgage Loans reported

to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart

below, instead of 4,533 loans being owner occupied, as represented in the Offering Materials, only 4,014 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Percentage of Loans Covering Primary Residences | 4,533 loans (97.34%) | 4,014 loans (86.19%) |

### (8)   ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3

206.   The Offering Materials for the Series 2007-HE3 securitization represented that 3,222 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 16.10% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 3,222 loans being owner occupied, as represented in the Offering Materials, only 2,704 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Percentage of Loans Covering Primary Residences | 3,222 loans (95.16%) | 2,704 loans (76.86%) |

### (9)   ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4

207.   The Offering Materials for the Series 2007-HE4 securitization represented that 4,448 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 12.46% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart

below, instead of 4,448 loans being owner occupied, as represented in the Offering Materials, only 3,894 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Percentage of Loans Covering Primary Residences | 4,448 loans (93.68%) | 3,894 loans (81.91%) |

### (10)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1

208.    The Offering Materials for the Series 2007-SL1 securitization represented that 4,312 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 13.91% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 4,312 of the loans being owner occupied, as represented in the Offering Materials, only 3,712 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 4,312 loans (66.78%) | 3,712 loans (57.49%) |

### (11)     ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2

209.    The Offering Materials for the Series 2007-WM2 securitization represented that 3,922 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 15.80% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart

below, instead of 3,922 of the loans being owner occupied, as represented in the Offering

Materials, only 3,302 loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 3,922 loans (96.89%) | 3,302 loans (81.57%) |

## VII.   LIABILITY OF THE SPONSOR, DEPOSITORS, AND UNDERWRITERS AS SELLERS OF SECURITIES TO MASSMUTUAL

210.    The defendants that qualify as sellers of securities under the Massachusetts

Uniform Securities Act are the Sponsor (DB Structured Products), Depositors (Deutsche Alt-A

and ACE), and Underwriter (DB Securities).  Each of these is primarily liable for

misrepresentations in the Offering Materials under Massachusetts General Laws, Chapter 110A,

Section 410(a)(2).

211.    As the Sponsor for the securitizations at issue, DB Structured Products acquired

the mortgage loans that were pooled together in the securitizations, and then sold, transferred, or

otherwise conveyed title to those loans to the Depositors pursuant to Pooling and Servicing

Agreements.  DB Structured Products had responsibility for preparing the Offering Materials that

were used to solicit purchases of the Certificates, and was identified on the Prospectuses and

Prospectus Supplements.  DB Structured Products profited from the sales of the Certificates.

212.    As the Depositors for the securitizations at issue, Deutsche Alt-A and ACE

purchased the mortgage loans from DB Structured Products pursuant to the Pooling and

Servicing Agreements.  The Depositors then sold, transferred, or otherwise conveyed the

mortgage loans to the Trusts, which held the loans as collateral for the Certificates.  The

Depositors had responsibility for preparing the Offering Materials that were used to solicit

purchases of the Certificates, and were identified on the Prospectuses and Prospectus Supplements.  In addition, the Depositors were responsible for registering the offerings with the Securities and Exchange Commission.  The Depositors profited from the sales of the Certificates.

213.    The Trusts issued the Certificates that were sold to investors, including MassMutual.  The Trusts had no autonomy or assets of their own, but were mere agents of the Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Sponsor and Depositors and issuing the Certificates for sale to the investors.

214.    The Sponsor and Depositors used DB Securities as the Underwriter to market and sell the Certificates.  The Underwriter was responsible for underwriting and managing the sale of Certificates, including screening the mortgage loans for compliance with the appropriate underwriting guidelines.  The Underwriter profited from the sales of the Certificates.

215.    The Sponsor, Depositors, and Underwriter successfully solicited MassMutual's purchase of the Certificates at issue.  The Underwriter transferred title in the Certificates to MassMutual.

## VIII.   LIABILITY OF THE REMAINING DEFENDANTS AS CONTROL PERSONS
### Anilesh Ahuja

216.    As Global Head of Deutsche Bank's Residential Mortgage-Backed Securities Group, Ahuja had intimate knowledge and control over DB's securitizations.  As President of Deutsche Alt-A, he was involved in the day-to-day affairs of this primary violator.  Ahuja also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following five securitizations:

> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1
> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

### Jeffrey Lehocky

217.    As Chief Financial Officer of Deutsche Bank, Lehocky had intimate knowledge and control over the enterprise's finances, including revenue generation from securitizations.  As Treasurer and Director of Deutsche Alt-A, Lehocky was involved in the day-to-day financial affairs of this primary violator.  Lehocky also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following five securitizations:

> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1
> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

### Michael Commaroto

218.    As head of Deutsche Bank's private label mortgage-backed securities group, Commaroto had intimate knowledge and control over DB's mortgage-backed securitizations.  As an officer of DB Structured Products and inside director and former President of Deutsche Atl-A, Commaroto was involved in the day-to-day affairs of these primary violators.  Commaroto also had control over the securitizations at issue, as evidenced by his signature on the registration statement for the following securitization:

> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1

### Joseph Rice

219.    As an officer of DB Structured Products and inside director of Deutsche Atl-A, Rice was involved in the day-to-day affairs of these primary violators.  Rice also had control

over the securitizations at issue, as evidenced by his signature on the registration statements for the following five securitizations:

> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1
> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

### Richard D'Albert

220.    As Global Head of the Securitized Products Group for Deutsche Bank, D'Albert had intimate knowledge and control over DB's securitizations.  As an inside director of Deutsche Alt-A, D'Albert was involved in the day-to-day affairs of this primary violator.  D'Albert also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following five securitizations:

> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AF1
> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

### Richard Ferguson

221.    As Treasurer of the Americas of Deutsche Bank, Ferguson had intimate knowledge and control over the enterprise's finances.  As an inside director of Deutsche Alt-A, Ferguson was involved in the day-to-day affairs of this primary violator.  Ferguson also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following four securitizations:

> Deutsche Alt-A Securities, Inc. Mortgage Loan Trust, Series 2006-AR2
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5
> Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

**Douglas Johnson**

222.    As President and a director of ACE, D. Johnson was involved in the day-to-day affairs of this primary violator.  D. Johnson also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following six securitizations:

> ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4

**Evelyn Echevarria**

223.    As an officer and director of ACE, Echevarria was involved in the day-to-day affairs of this primary violator.  Echevarria also had control over the securitizations at issue, as evidenced by her signature on the registration statements for the following six securitizations:

> ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4

**Juliana Johnson**

224.    As the Treasurer and a director of ACE, J. Johnson was involved in the day-to-day affairs of this primary violator.  J. Johnson also had control over the securitizations at issue, as evidenced by her signature on the registration statements for the following six securitizations:

> ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-SL1
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-ASAP1
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-WM2
> ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4

## FIRST CAUSE OF ACTION
### (Primary Violations of the Massachusetts Uniform Securities Act)

225.    MassMutual incorporates by reference and realleges each and every allegation as set forth above in paragraphs 1 through 224 as if fully set forth herein.

226.    Under Massachusetts General Laws, Chapter 110A, Section 410(a)(2), any person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," is liable to the purchaser of the security.

227.    The Sponsor (DB Structured Products), Depositors (Deutsche Alt-A and ACE), and Underwriter (DB Securities) qualify as sellers of the Certificates because they issued, marketed, and/or sold the Certificates to the public for their own financial benefit.

228.    The Sponsor, Depositors, and Underwriter offered to sell and sold the Certificates to MassMutual in the State of Massachusetts.

229.    The Sponsor, Depositors, and Underwriter offered and sold the Certificates to MassMutual by means of false and misleading statements of material fact and omissions of material facts necessary to make the statements made not misleading.

230.    As set forth in more detail in paragraphs 41 to 209 above, the public statements of the Sponsor, Depositors, and Underwriter, including in the Offering Materials, were materially false and misleading because, among other things, they misrepresented the underwriting standards applied to the mortgage loans backing the Certificates, misrepresented the LTV and appraisal information for the loans, and misrepresented the owner-occupancy information for the loans.

231.    MassMutual did not know, and in the exercise of due diligence could not have known, of the untruths and omissions.

232.    MassMutual will elect its remedy before the entry of judgment.  For each Certificate, MassMutual will seek statutory damages, including interest, or will make or arrange a tender before entry of judgment.

## SECOND CAUSE OF ACTION
### (Joint and Several Liability Under the Massachusetts Uniform Securities Act)

233.    MassMutual incorporates by reference and realleges each and every allegation as set forth above in paragraphs 1 through 232 as if fully set forth herein.

234.    Under Massachusetts General Laws, Chapter 110A, Section 410(b), "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, [and] every person occupying a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller.

235.    As set forth above, the Sponsor (DB Structured Products), the Depositors (Deutsche Alt-A and ACE), and the Underwriter (DB Securities) are liable as sellers under subsection (a).

236.    Defendant Anilesh Ahuja is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

237.    Defendant Jeffrey Lehocky is jointly and severally liable to the same extent as the primary violators because he was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

238.     Defendant Michael Commaroto is jointly and severally liable to the same extent as the primary violators because he was an officer and/or director of one or more primary violators and controlled their operations, including the securitizations at issue.

239.     Defendant Joseph Rice is jointly and severally liable to the same extent as the primary violators because he was an officer and/or director of one or more primary violators and controlled their operations, including the securitizations at issue.

240.     Defendant Richard D'Albert is jointly and severally liable to the same extent as the primary violators because he was a director of one or more primary violators and controlled their operations, including the securitizations at issue.

241.     Defendant Richard Ferguson is jointly and severally liable to the same extent as the primary violators because he was a director of one or more primary violators and controlled their operations, including the securitizations at issue.

242.     Defendant Douglas Johnson is jointly and severally liable to the same extent as the primary violators because he was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

243.     Defendant Evelyn Echevarria is jointly and severally liable to the same extent as the primary violators because she was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

244.     Defendant Juliana Johnson is jointly and severally liable to the same extent as the primary violators because she was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

## **PRAYER FOR RELIEF**

WHEREFORE MassMutual prays for relief as follows:

1.      On the first cause of action, for primary violations of the Massachusetts Uniform

Securities Act, relief in the form of damages and/or statutory recovery upon

tender;

2.      On the second cause of action, for joint and several liability under the

Massachusetts Uniform Securities Act, relief in the form of damages and/or

statutory recovery upon tender; and

3.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), MassMutual hereby demands a trial by jury on all issues triable by jury.


DATED:  February 15, 2011

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY


By:   /s/ Bernadette Harrigan
Bernadette Harrigan (Mass. Bar No. 635103)
Assistant Vice President & Counsel
Massachusetts Mutual Life Insurance Company
1295 State Street
Springfield, Massachusetts 01111
Telephone:  413-788-8411
Fax:  413-226-4268


Of counsel:

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP

Philippe Z. Selendy
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  212-849-7000
Fax:  212-849-7100

A. William Urquhart
Harry A. Olivar, Jr.
Molly Stephens
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  213-443-3000
Fax:  213-443-3100