UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS MUTUAL LIFE                 *
INSURANCE COMPANY,                        *
                                          *
         Plaintiff,                       *
                                          *
         v.                               *
                                          *   Civil Action No. 11-30039-MGM
DB STRUCTURED PRODUCTS, INC., et al.      *
                                          *
                                          *
         Defendants.                      *

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON DEFENDANT DEUTSCHE BANK'S DUE
DILIGENCE AFFIRMATIVE DEFENSE
(Dkt. No. 333)

June 22, 2015

MASTROIANNI, U.S.D.J.

I.   INTRODUCTION

Massachusetts Mutual Life Insurance Company ("Plaintiff") brought eleven related actions against various defendants, asserting violations of MASS. GEN. LAWS ch. 110A, § 410, the Massachusetts Uniform Securities Act ("MUSA"), for misstatements and omissions contained in the offering documents of certain residential mortgage-backed securities ("RMBS"). The instant action (11-cv-30039-MGM), brought against Deutsche Bank Securities Inc. ("DBSI"), Anilesh Ahuja, Michael Commaroto, Richard D'Albert, and Richard Ferguson (together, "Defendants"), was designated a "bellwether" case by Judge Saris on December 4, 2013.[1] (See Dkt. No. 225.) Accordingly, it is scheduled to proceed through summary judgment and trial while the other cases are stayed.

---

[1] The second bellwether action, 11-cv-30215-MGM, was settled by the parties and closed by the court on December 24, 2014. (See 11-cv-30125, Dkt. No. 421.)

Presently before the court is Plaintiff's motion for partial summary judgment to preclude DBSI from asserting a due diligence affirmative defense (Dkt. No. 333). For the following reasons, the court concludes that, for nine of the ten securitizations, the reasonableness of DBSI's due diligence is a question for the fact-finder and, therefore, will deny Plaintiff's motion as to those securitizations. For the ACE 2007-HE3 securitization, however, the court concludes that DBSI's due diligence was inadequate as a matter of law, since over 80% of the loans comprising the securitization derived from loan pools which were not subjected to in-depth diligence reviews at the time of acquisition, nor anytime thereafter. Accordingly, the court will grant Plaintiff's motion as to the ACE 2007-HE3 securitization.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Bellone v. Southwick-Tolland Regional School Dist., 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994). At summary judgment, the court looks "to all of the record materials on file, including the pleadings, depositions, and affidavits." Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014). The court must then view these facts and all reasonable inferences that might be drawn from them in the light most favorable to the non-moving party. Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004). "The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of [any disputed] material fact." Mendes

2

v. Medtronic, Inc., 18 F.3d 13, 15 (1st Cir. 1994) (discussing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

III. BACKGROUND

The parties do not dispute the following facts, which are construed in the light most favorable to Defendants, the non-moving parties.

DBSI acted as the underwriter and its affiliate, DB Structured Products, Inc. ("DBSP"), acted as the sponsor for the ten securitizations at issue in this action. As sponsor, DBSP acquired the mortgage loans backing the securitizations from three sources: bulk whole loan purchases from third-party originators, individual loans and small loan pools obtained through its correspondent lending group ("CLG"),[2] and originators affiliated with DBSI (namely, Chapel Funding, LLC ("Chapel"), and Mortgage IT, Inc. ("Mortgage IT")).[3] (Dkt. No. 376, Defs.'s Local Rule 56.1 Reply to Plaintiff's Statement of Undisputed Material Facts ("Defs.'s Reply SOF") ¶ 88.) Two securitizations (ACE 2006-ASAP4 and ACE 2007-ASAP1) were comprised of loans from the CLG. (Id. ¶ 89.) The other eight securitizations were comprised largely of loans acquired from bulk whole loan purchases, and three of these securitizations (DBALT 2006-AR5, DBALT 2006-AR6, and ACE 2007-HE4) included loans from originators affiliated with DBSI. (Id. ¶ 90; Dkt. No. 481, Decl. of Molly Stephens ("Stephens Decl."), Exs. 56, 119-121.) DBSP performed due diligence on loans acquired through the bulk whole loan and CLG channels at the time of acquisition ("Acquisition Diligence"). (Dkt. No. 347, Pl.'s Statement of Material Undisputed Facts ("Pl.'s SOF") ¶ 1; Defs.'s Reply SOF ¶ 114; Dkt. No. 377, Declaration of Meredith Duffy ("Duffy Decl."), Exs. 5-6.) Much

---

[2] Through the CLG, DBSP acquired individual loans and small pools of loans underwritten to its own guidelines, rather than the originator's guidelines. (Dkt. No. 376, Defs.'s Local Rule 56.1 Reply to Plaintiff's Statement of Undisputed Material Facts ("Defs.'s Reply SOF") ¶ 89.)
[3] DBSI's parent company, Deutsche Bank AG, acquired Chapel in September, 2006, and MortgageIT in January, 2007. (Dkt. No. 347, Pl.'s Statement of Material Undisputed Facts ("Pl.'s SOF") ¶¶ 52, 60.)

3

of the parties' dispute in this motion comes down to whether it was unreasonable as a matter of law for DBSI to rely on this Acquisition Diligence performed by DBSP.

The Acquisition Diligence included loan-level credit, compliance, and property valuation reviews between the time DBSP bid on a given loan-pool trade and the settlement of the trade. (Duffy Decl., Ex. 3 ¶ 21.) As an initial step, however, DBSP performed a counter-party assessment, which was a general review of the originator prior to purchasing any loans, including a review of the originator's corporate records, financial information, and underwriting policies. (Defs.'s Reply SOF ¶ 119.) For bulk whole loan purchases, DBSP also reviewed a potential originator's corporate structure, investor information, credit management policies, and policies and practices related to underwriting and pricing. (Id. ¶ 120.) DBSP also had a policy to monitor approved originators, including any changes to the originator's guidelines. (Id. ¶ 122.) For potential CLG originators, DBSP conducted a comprehensive review prior to approval, including a review of information about its finances and operation, government sponsored enterprise approval, and licensing and insurance coverage. (Id. ¶¶ 123-24.)

DBSP also instructed third-party diligence vendor, Clayton Holdings LLC ("Clayton"), to perform a data integrity review for potential bulk whole loan purchases. (Id. ¶ 127.) After receiving the "bid tape" from a potential originator, DBSP would have Clayton compare data in the tape with the loan files and report any discrepancies to DBSP. (Id. ¶¶ 126-27.)

A. <u>Credit and Compliance Diligence</u>

Next, DBSP performed loan-level credit and compliance due diligence. For bulk whole loan acquisitions, DBSP usually reviewed a sample of loans for credit compliance, which would include re-underwriting the mortgage loans against the originator's underwriting guidelines and assessing whether the borrower had the ability to repay the loan. (Id. ¶ 128; Stephens Decl., Ex. 13 at 159-

4

60.)[4] DBSP's compliance due diligence involved reviewing a sample of loans to determine compliance with federal, state, and local laws and regulations. (Id. ¶ 129.) Although DBSP sometimes performed credit and compliance due diligence on 100% of the loans in a pool, (id. ¶¶ 121, 128), it usually employed "adverse sampling," which involved selecting loans for the sample based on potentially high risk credit characteristics. (Id. ¶ 131.) DBSP also sometimes used targeted sampling, through which it identified loans to include in the sample based on specific issues, such as loans with comparatively large balances. (Id. ¶ 132.) In addition, DBSP occasionally used random sampling. (Id. ¶ 133.) After selecting the sample, DBSP would have Clayton perform an in-depth loan-level review. (Id. ¶ 142.) In addition to re-underwriting the loans to the originator's guidelines, Clayton also applied a set of additional screening criteria, or "overlays," developed by Joe Swartz, the head of DBSP's due diligence group, in response to trends in mortgage product types and origination practices. (Id.)

After evaluating the loan files against applicable guidelines and overlays, Clayton used a grading system of 1 to 3 to grade each loan based, separately, on its credit and compliance due diligence findings. (Id. ¶ 144.) A grade of 1 meant that the loan fully met the originator's underwriting guidelines and did not trigger one of DBSP's overlays. (Id.) A grade of 3 signified a preliminary evaluation that the loan had a material exception to the originator's guidelines, met the originator's guidelines but triggered one of DBSP's overlays, or was missing documentation or had other curable exceptions. (Id.) Initially, Clayton graded loans as 2 in the case of immaterial exceptions; eventually, DBSP instructed Clayton to stop grading loans as 2 and, instead, to only give grades of 1 or 3. (Id. ¶ 145.) DBSP did not review loans Clayton graded as 1 and only began reviewing loans with grades of 2 in the mid-to-late 2006. (Pl.'s SOF ¶ 32.) After reviewing the

---

[4] As discussed below, however, not all bulk whole loan purchases were subject to this review; in particular, loans from certain originators in the ACE 2007-HE4 securitization were not subjected to Acquisition Diligence. (Pl.'s SOF ¶¶ 41-44.)

5

grades, members of DBSP's due diligence group discussed the results with the relevant originator and, if they learned additional information or received additional documentation about certain loans, often re-graded the loans. (Defs.'s Reply SOF ¶ 149.) When issues could not be cured or DBSP did not believe an exception to guidelines and the overlay criteria was warranted, DBSP would exclude, or "kick," the loan from the pool and not acquire it. (Duffy Decl., Ex. 21 at 144-48.)

DBSP played an active role in supervising and monitoring Clayton, and Mr. Swartz communicated regularly with Kathy Ireland, Clayton's point person for DBSP's due diligence reviews. (Defs.'s SOF ¶ 151.) Moreover, Clayton's work for DBSP often involved assessing the accuracy or reasonableness of the information in the loan file. (Id. ¶ 154.) For example, DBSP's overlay instructions explicitly stated that Clayton reviewers should consider stated income loans to "determine that the stated income is reasonable for the employment stated and also to determine that it is reasonable in light of the credit history provided and cash verified." (Id.)

For loans acquired through DBSP's CLG program, Lydian Data Services ("Lydian"), another third-party diligence vendor, performed a comprehensive loan-level credit, compliance, and legal documentation review on 100% of the loans.[5] (Id. ¶¶ 156-57.) Lydian reviewed the loan documentation against the CLG's internal, pre-approval underwriting process, the Automated Underwriting System ("AUS") approval conditions worksheet, and validated program and product eligibility. (Id. ¶ 158.) Lydian's compliance review consisted of ensuring that loans were in accordance with local, state, and federal laws. (Id. ¶ 162.) Lydian also reviewed the loan files for closing documents to verify compliance with CLG programs and products. (Id. ¶ 163.) Moreover, Lydian reviewed the net benefit to the borrower and the borrower's ability to repay, tested for violations of interest rate requirements, verified that all documents were properly executed to create

---

[5] Although the parties were not able to collect Lydian's due diligence documents because of its bankruptcy, there are other documents and testimony in the record which reflect the due diligence work that Lydian and DBSP did. (Id. ¶ 155.)

6

a valid lien, and ensured completeness of servicing data that would be forwarded to the servicer. (Id.) Various CLG personnel provided Lydian with support and guidance. (Id. ¶ 164.) Lydian was not permitted to make exceptions to the underwriting guidelines. (Id. ¶ 161.)

B.  Property Valuation Diligence

Along with the credit and compliance due diligence, DBSP performed property valuation due diligence to assess the reasonableness of the subject property valuations. (Id. ¶ 169.) DBSP usually ran automated valuation models ("AVMs") on 100% of the loans in a pool for the bulk whole loan trades. (Id. ¶ 170.) AVMs are computer programs that use statistical models to reach objective estimates of the market value of real property. (Id. ¶ 171; Duffy Decl., Ex. 51 at 27.) Where the AVM did not return a value, also known as a "no hit," DBSP obtained a HistoryPro value, another computer tool which identified loans with a potentially high risk of mortgage fraud and/or early payment default. (Defs.'s Reply SOF ¶ 172.) DBSP would then compare the original appraised value of a property and the AVM value and typically ordered a broker price opinion ("BPO") if the variance between the two was at least 15%. (Id. ¶ 174.) A BPO was the result of a real estate professional evaluating the property value, but it generally did not entail the detailed property inspection associated with full appraisals. (Id. ¶ 175.) DBSP also typically ordered BPOs on the AVM "no hits." (Id.)

After receiving the BPO results, DBSP then reviewed the loans that had a variance of 15% or more between the appraised value and the BPO result. (Id. ¶ 176.) DBSP also considered additional information provided by originators that might explain discrepancies between the appraised value and the BPO and, sometimes, became comfortable that the property value in the original appraisal was reasonable. (Id. ¶ 179.) If DBSP did not become comfortable with the

7

original appraisal's property value after receiving additional information, it would kick the loan from the pool. (Id.)

The CLG valuation due diligence was similar to the whole loan bulk purchase process. Lydian conducted a review of the valuation of all the loans by running an AVM. (Id. ¶ 183.) If the Lydian underwriter determined that the AVM result did not support the appraisal valuation, the Lydian underwriter elevated the loan to Lydian's appraisal department and then to DBSP. (Id. ¶ 184.) If DBSP agreed with Lydian that there was a risk the valuation was unsupported, DBSP ordered a more detailed independent appraisal from a list of approved appraisers. (Id. ¶ 185.) Finally, if that independent appraiser agreed that the original property value was unsupported, DBSP did not purchase the loan. (Id.)

C.   Chapel and MortgageIT

As mentioned, Deutsche Bank AG acquired Chapel in September, 2006, and MortgageIT in January, 2007. (Pl.'s SOF ¶¶ 52, 60.) Prior to their acquisitions, DBSP reviewed loans from these originators in the same manner as it did for any other originator. (Defs.'s SOF ¶ 187.) After their acquisitions, however, DBSP ceased conducting Acquisition Diligence on loans originated by Chapel and MortgageIT.[6] (Pl's SOF ¶ 65.) But post-acquisition, Defendants explain, DBSP employees had greater familiarity with and input into Chapel and MortgageIT product offerings and underwriting

---

[6] Although, as mentioned, three securitizations (DBALT 2006-AR5, DBALT 2006-AR6, and ACE 2007-HE4) included loans from affiliated originators Chapel and MortgageIT, it appears that only ACE 2007-HE4 included loans which derived from these originators <u>after</u> DBSP formally acquired them and, thus, it is only these loans on which DBSP did not conduct Acquisition Diligence. (Pl.'s SOF ¶ 43-44.) The ACE 2007-HE4 securitization is discussed in more detail below. For the other two securitizations, DBSP appears to have settled, or purchased, loans from Chapel and Mortgage IT between the time it entered into an agreement to acquire these originators and formal acquisition. (Defs.'s Reply SOF ¶¶ 52, 60; Stephens Decl., Exs. 119-121.) Accordingly, looking at the facts in the light most favorable to Defendants, DBSP did conduct Acquisition Diligence on the loans originated by Chapel and MortgageIT for the DBALT 2006-AR5 and DBALT 2006-AR6 securitizations.

8

guidelines, and managed the post-close quality control process for both originators. (Defs.'s SOF ¶ 188.)

D.  ACE 2007-HE4

The loans in the ACE 2007-HE4 securitization were selected from one whole loan pool acquired from ResMAE Mortgage Corp. ("ResMAE") on February 1, 2007, two whole loan pools acquired from New Century Mortgage Corporation ("New Century") on March 16, 2007, multiple loan purchases from Chapel made between June 1, 2006 and February 1, 2007, multiple loan purchases from MortgageIT between January 22, 2007 and February 12, 2007, and loan purchases from other originators. (Pl.'s SOF ¶ 40; Defs.'s Reply SOF ¶ 40.) DBSP did not perform Acquisition Diligence on any of the loans in the ResMAE whole loan pool, the New Century whole loan pool, the Chapel loan purchases, or the MortgageIT loan purchases that contributed to the ACE 2007-HE4 securitization. (Pl.'s SOF ¶¶41-44.) In all, over 80% of the loans in the ACE 2007-HE4 securitization were selected from these originators and, accordingly, were part of loan pools which did not receive any Acquisition Diligence. (Id. ¶ 45.)

E.  DBSI's Involvement and Understanding of Due Diligence Work

Mr. Swartz, the head of DBSP's due diligence group, would send findings from some diligence reviews and written reports summarizing the due diligence that was performed to Susan Valenti, who was the head of DBSI's RMBS securitization group, or her colleagues in the securitization group. (Id. ¶ 190.) Ms. Valenti testified that "for the purpose of reviewing disclosures in the prospectus supplement," she received summaries of due diligence performed on samples of loans for securitizations that she oversaw or worked on. (Id. ¶ 191.) Sometimes, Ms. Valenti would consult with the trading desk, as well as Mr. Swartz, regarding the appropriate diligence samples size.

(Id. ¶ 192.) In general, however, neither the securitization group nor the due diligence group would consult the trading desk on such decisions; rather, the sample size was typically negotiated between the trading desk and the originator, which sought to limit the sample size. (Dkt. No. 399, Plaintiff's Response to Defendant's Counterstatement of Material Facts ("Pl.'s Response SOF") ¶ 192; Pl.'s SOF ¶ 27; Defs.'s Reply SOF ¶ 27.) Ms. Valenti sometimes received due diligence summary reports directly from the due diligence providers. (Defs.'s Reply SOF ¶ 193.) After receiving due diligence summaries, Ms. Valenti and Mr. Swartz, who worked on the same floor, often discussed the findings. (Id.)

F.      Securitization

Following Acquisition Diligence, DBSP selected the mortgage loans to include in each securitization from a combination of one or more bulk whole loan trades, loans acquired from the CLG channel, or loans acquired from affiliated originators Chapel and MortgageIT. Specifically, the loan pools underlying six of the ten securitizations (DBALT 2006-AF1, DBALT 2006-AR2, DBALT 2006-AR3, DBALT 2006-AR5, DBALT 2006-AR6, and ACE 2007-HE4) were comprised of loans from between 16 and 100 different bulk whole loan trades, combined with loans from other channels such as the CLG. (Pl.'s SOF ¶ 25.) Two securitizations (ACE 2007-HE3 and ACE 2007-WM2) were comprised of loans from single bulk whole loan trades. (Id. ¶¶ 17-18; Defs.'s Reply SOF ¶ 24.) And, as mentioned, two securitizations (ACE 2006-ASAP4 and ACE 2007-ASAP1) were comprised of loans from the CLG. (Defs.'s Reply SOF ¶ 89.) DBSP collateral analysts in the financial engineering group combined loans to achieve the desired structure, including cash-flow and ratings, for the securitization. (Stephens Decl., Ex. 1 at 77-80, 193-95; Ex. 5 at 355-356, 359; Ex. 31 at 271-73.) The period of time during which DBSP held loans between acquisition and

10

securitization varied greatly; many loans were held for at least two or three months, and some loans were held for more than a year. (Pl.'s SOF ¶¶ 11-19; Defs.'s Reply SOF ¶¶ 11-19.)

After the loans were aggregated and securitized, certificates representing rights to principal and interest payments from the underlying loan pool were issued for sale to investors. DBSI marketed and sold the certificates to Plaintiff pursuant to offering documents which included representations about underwriting guidelines used to originate the loans, appraisal standards used to value the mortgaged properties, and loan characteristics. (Pl.'s SOF ¶ 8.) DBSI did not substantively review the loans at the time of securitization. (Id. ¶ 3.)[7] Rather, it relied on Acquisition Diligence conducted by DBSP at the time the loans were acquired. (Id. ¶ 4.)

G.   Mr. Grice's Expert Report

DBSI submitted an expert report by Charles Grice, who holds a Master's Degree from Harvard University and has over 30 years of experience working as a consultant with financial institutions on regulatory and risk management matters, including work for the Federal Reserve Board, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation. (Defs.'s Reply SOF ¶ 199; Duffy Decl., Ex. 3 ¶ 1-2, 9.) Among other matters, Mr. Grice reviewed Deutsche Bank's due diligence practices, focusing on the trades that contributed the majority of loans to the securitizations at issue. (Defs.'s Reply SOF ¶ 200; Duffy Decl., Ex. 3.) In particular, he examined the procedural documentation associated with

---

[7] DBSI did, however, hire a third-party accountant, Deloitte & Touche LLP ("Deloitte"), to confirm calculations in the offering documents based on the data listed in the loan tape, but Deloitte did not examine the accuracy of the data. (Defs.'s Reply SOF ¶¶ 1, 196; Pl.'s SOF ¶ 21.) DBSI also received "negative assurance letters" for the securitizations from outside counsel, McKeen Nelson LLP and Thacher Proffitt & Wood, LLP, in which counsel stated that it was not aware of any material misstatements or omissions in the offering documents. (Defs.'s Reply SOF ¶¶ 1, 197.) However, these negative assurance letters explicitly stated that counsel were not engaged to "establish or confirm factual matters" in the offering documents, did not "verify independently any of the matters" in the offering documents, and did not "assume any responsibility for the accuracy, completeness or fairness of the statements contained in" the offering documents. (Pl.'s SOF ¶ 22.)

11

each trade, the size and makeup of the sample, the credit and compliance loan-level results, and the valuation loan-level results for all the Major Bulk Trades.[8] (Id.) Mr. Grice concluded that adverse sampling was a "best practice" and the size of the samples was reasonable, DBSP's "restrictive" overlay was the most rigorous he had seen in his 30 years of experience, and DBSI was entitled to rely on the Acquisition Diligence since "[s]ponsors have strong incentive to conduct appropriate level due diligence." (Id.) Ultimately, Mr. Grice concluded that Deutsche Bank's due diligence practices for the securitizations were consistent with and, at times, exceeded industry practices. (Id.) He further found the due diligence provided reasonable grounds for Deutsche Bank to believe the disclosures in the offering documents did not contain material false or misleading statements or omit material facts. (Id.)

## IV. MUSA'S DUE DILIGENCE DEFENSE

Under § 410(a)(2) of MUSA, a defendant may avoid liability for misstatements or omissions used to offer or sell securities by establishing a due diligence affirmative defense. This defense requires the defendant to demonstrate that it "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." MASS. GEN. LAWS ch. 110A, § 410(a)(2). The Supreme Judicial Court has explained that the due diligence defense, in essence an "inverse negligence standard," entails a "heavy burden of proof" and is "a very difficult defense to sustain." Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1026 (Mass. 2004) (internal quotation marks omitted). Nonetheless, because the defense necessitates an extremely fact-intensive inquiry, and because questions of "reasonableness" are usually left to the fact-finder, courts addressing the

---

[8] Mr. Grice defined "Major Bulk Trades" as those whole loan trades from originators who contributed 5% or more and 100 or more loans to a securitization. (Duffy Decl., Ex. 3 ¶ 104.)

12

issue in the analogous federal securities law[9] context repeatedly state that the due diligence affirmative defense generally cannot be resolved on a motion for summary judgment. See In re Software Toolworks Inc., 50 F.3d 615, 621 (9th Cir. 1994) ("[S]ummary judgment is generally an inappropriate way to decide questions of reasonableness because 'the jury's unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgment.'" (quoting TSC Indus. v. Northway, Inc., 426 U.S. 438, 450 n.12 (1976))); In re WorldCom, Inc. Securities Litig., 2005 WL 638268, at *11 (S.D.N.Y. March 21, 2005) ("A defendant's assertion of the due diligence defense requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which the . . . claim is premised," and "such fact-intensive inquiries do not lend themselves easily to resolution on summary judgment.").

## V. ANALYSIS

Plaintiff asserts DBSI's due diligence affirmative defense fails as a matter of law. In particular, Plaintiff argues DBSI failed to conduct an independent investigation to verify the accuracy of the statements in the offering documents; rather, it improperly relied on DBSP's Acquisition Diligence. Plaintiff also contends that, even if DBSI could rely on DBSP's due diligence, those reviews were unreasonable because they were conducted on different pools of loans than the pools backing the securitizations, the samples were inadequate, and DBSI ignored red flags raising concerns about originator non-compliance with underwriting guidelines and inflated property values. Lastly, Plaintiff argues that DBSI cannot prove any investigation occurred regarding loans that contributed all or a vast majority of loans to three securitizations: those comprised entirely of

---

[9] Because § 410(a)(2) of MUSA "is almost identical with § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2)," the Supreme Judicial Court and the Massachusetts Legislature have directed courts to interpret MUSA in coordination with Section 12(a)(2) of the federal Securities Act. Marram, 809 N.E.2d at 1025 (internal quotation marks omitted). The court also looks to interpretations of § 11 of the Securities Exchange Act for the reasons discussed below.

13

loans from the CLG (ACE 2006-ASAP4 and ACE 2007-ASAP1), as well as ACE 2007-HE4. Except as to the ACE 2007-HE4 securitization, discussed below, the court concludes that Plaintiff's arguments raise questions reserved for the fact-finder as to the reasonableness of the due diligence conducted.

As an initial matter, the court rejects Defendants' assertion that a plaintiff may not seek to preclude the due diligence defense until after it proves its prima facie case. As Judge Cote explained in <u>Fed. Hous. Fin. Agency v. Nomura Holding America, Inc.</u>, --- F.Supp.3d ----, 2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014), "whether the challenged representations were or were not accurate has no bearing on whether Defendants undertook a reasonable investigation or exercised reasonable care to assure themselves they were." <u>Id.</u> at *39. "It could be the case, for instance, that the representations in the Offering Documents were perfectly true. If so, FHFA will not be able to prove the elements of its claims, and Defendants will not be liable." <u>Id.</u> "But, this would do nothing to improve Defendants' due diligence, and Defendants would still not be entitled to the protection of a due diligence or reasonable care defense." <u>Id.</u> Moreover, as Plaintiff points out, courts often address motions for summary judgment brought by plaintiffs seeking to preclude affirmative defenses without first requiring the plaintiff to prove its prima facie case. <u>See</u>, <u>e.g.</u>, <u>Sony BMG Entm't v. Tenebaum</u>, 672 F. Supp. 2d 217 (D. Mass. 2009). Defendants' position would mean that a plaintiff could never obtain summary judgment on a defendant's affirmative defense—even those more susceptible to resolution on summary judgment than this one—without first winning its prima facie case.

The court also disagrees with Plaintiff's assertion that DBSI must demonstrate a "reasonable investigation" to sustain its due diligence defense, as opposed to "reasonable care," to the extent these standards differ in any meaningful way. Section 410(a)(2) of MUSA, like Section 12(a)(2) of the Securities Act of 1933, uses the language "reasonable care" to describe the level of diligence a

14

defendant must demonstrate. MASS. GEN. LAWS ch. 110A, § 410(a)(2); see also 15 U.S.C. § 77l(2). In contrast, Section 11 of the Securities Exchange Act of 1934 provides that, for the non-expert portions of the registration statement, a defendant must show it conducted a "reasonable investigation" to ensure the statements were true and did not omit material facts in order to sustain the due diligence defense. 15 U.S.C. § 77k(b)(3). This reading—that a defendant must only show "reasonable care" and not a "reasonable investigation"—is consistent with the SEC's own interpretation issued in 2005. See SEC Release No. 8591, 2005 WL 1692642, at *79 (Aug. 3, 2005) ("We believe, however, as we have stated previously, that the standard of care under Section 12(a)(2) is less demanding than that prescribed by Section 11 or, put another way, that Section 11 requires a more diligent investigation than Section 12(a)(2).").[10] Both before and since the SEC issued its interpretation, other court have held that a reasonable care due diligence defense under Section 12(a)(2) "is less demanding than the duty of due diligence imposed under Section 11." In re WorldCom, Inc. Securities Litig., 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004); see also Fed. Hous. Fin. Agency v. Nomura Holding America, Inc., 2014 WL 7232443, at *30; In re Fuwei Films Securities Litig., 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009). Moreover, treating the two standards somewhat differently comports with the principle of statutory interpretation that "[w]here the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning." Burrus v. Vegliante, 336 F.3d 82, 89 (2d Cir. 2003) (quoting United States v. Wilson, 290 F.3d 347, 360 (D.C. Cir. 2002)) see also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 200 (1976) ("It is thus evident that Congress fashioned standards of fault in the express civil remedies in the [Securities Act of] 1933 and [the Securities Exchange Act of] 1934 . . . on a particularized basis. Ascertainment of congressional intent with respect to the

---

[10] The SEC's interpretation is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984). See, e.g., S.E.C. v. Cavanagh, 445 F.3d 105, 114 (2d Cir. 2006).

standard of liability created by a particular section of the Acts must therefore rest primarily on the language of that section.").

This interpretation is not inconsistent with the First Circuit's much earlier decision in Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996), in which it indicated in a single citation sentence that "the two articulations of due diligence are 'similar,' if not identical." Id. at 628 (citing In re Software Toolworks Inc., 50 F.3d at 621). For purposes of its decision in Glassman, the First Circuit did not need to consider whether the § 12 due diligence standard (or, by analogy, the MUSA standard) is actually less demanding than the § 11 standard because the First Circuit found the plaintiff's allegations were insufficient with respect to either.[11] In citing In re Software Toolworks Inc., the First Circuit, noting a scarcity of law, sought to enlarge the number of sources that could provide insight into how the provisions of § 11 and § 12 could be interpreted. Given the context in which the First Circuit used language suggesting the two articulations of due diligence might have identical meanings, together with the developments in this area in the nearly twenty years since the First Circuit decided Glassman, this court does not consider the Glassman use of a citation to be a controlling statement holding that the standards are identical. Rather, this citation reference was an articulation of the court's basis for looking to both standards to best understand their scope.

The main question is whether DBSI's reliance on DBSP's Acquisition Diligence was unreasonable as a matter of law. Plaintiff contends that it was DBSI's responsibility as the underwriter to guard against material misrepresentations and omissions. Plaintiff asserts DBSI had an even greater obligation to conduct independent due diligence reviews because it was financially intertwined with DBSP, its affiliate. The reasonableness of DBSI's reliance on the Acquisition Diligence, the court concludes, is a jury question. As Defendants point out, this case, involving

---

[11] Notably, the First Circuit in Glassman was not addressing due diligence as an affirmative defense asserted by the defendant. Rather, it was addressing the plaintiff's claim that the defendant made material misrepresentations in the prospectus supplement in asserting that due diligence had been performed. Id. at 627.

16

RMBS, is different from the typical corporate securities offering. In the typical securities context, it is the financial health of the issuing company which matters to an investor; here, it is the assets acquired from the originators, the residential mortgages, that provides the value. Accordingly, the originators are somewhat more analogous to the issuers in the typical securities setting, and the concerns about financial ties between the issuer and the underwriter are not necessarily at play.[12] In addition, as even the cases Plaintiff relies upon acknowledge, "a completely independent and duplicative investigation is not required." Feit v. Leasco Data Processing Equipment Corp., 332 F. Supp. 544, 577 (E.D.N.Y. 1971) (citing Escott v. BarChris Construction Corp., 283 F. Supp. 643, 690 (S.D.N.Y. 1968)).

The court also cannot conclude the samples or timing of the diligence reviews were per se unreasonable. Whether DBSP's sampling methodology was reasonable is also a jury question. See Freeman v. Package Machinery Co., 865 F.2d 1331, 1342 n.5 (1st Cir. 1988); Ford Motor Co. v. Zahn, 265 F.2d 729, 732-33 (8th Cir. 1959); SQP, Inc. v. Sirrom Sales, Inc., 130 F.Supp.2d 364, 368 (N.D.N.Y. 2001). Neither DBSP nor DBSI were required to review every loan that made it into a securitization. See Feit, 332 F. Supp. at 577 ("To require an audit would obviously be unreasonable." (quoting BarChris, 283 F. Supp. at 690)). And Mr. Grice, DBSI's expert, opined both that adverse sampling was a "best practice" and that the sample sizes DBSP utilized were reasonable.[13] In addition, contrary to Plaintiff's assertion, the extent to which DBSI's due diligence practices comported with or exceeded prevailing industry standards may be relevant to the reasonableness determination. See Federal Hous. Fin. Agency, 2014 WL 7232443, at *28 ("Industry standards are relevant to the reasonableness inquiry . . . ."); see also Donovan v. General Motors

---

[12] Rather, any financial ties between the originator and the issuer and/or underwriter would be more concerning in the RMBS context.

[13] Mr. Blum, Plaintiff's due diligence expert, offered no opinion on the sample sizes. (Duffy Decl., Ex. 19 at 197-98.) And, although he did opine that adverse sampling was insufficient, this and other conflicts in expert testimony generally must be resolved by the jury. See Abbott GmbH & Co., KG v. Centocor Ortho Biotech, Inc., 870 F. Supp. 2d 206, 250 (D. Mass. 2012).

17

Corp., 764 F.2d 32, 37 (1st Cir. 1985) ("[I]n most instances reference to industry custom and practices will establish the standard of conduct." (internal quotation marks omitted)).

Moreover, conducting the reviews at the time of acquisition may have been reasonable. It makes some sense to review the loans at acquisition, which is closer to the origination date, rather than at the securitization stage. Granted, post-origination information may also shed light on the accuracy of the loan information as of origination, and it may be unreasonable not to update that information by the effective date of the offering. For purposes of summary judgment, however, Plaintiff has not demonstrated that the Acquisition Diligence was stale as a matter of law. As for Plaintiff's argument that DBSP conducted the Acquisition Diligence on different pools of loans than the ones underlying the securitizations, that is true, but the statistics regarding the specific loans selected for securitization followed the loans into the newly constructed loan pools. The real question is whether the sampling was under-representative such that DBSI did not have reasonable grounds to believe the representations in the offering documents were accurate; but, again, this is a jury question as to the reasonableness of the sampling methodology.

Plaintiff's contention that DBSP and DBSI ignored red flags also raises a jury question. See In re WorldCom, 2005 WL 638268, at *8 ("What constitutes a red flag is an exquisitely fact intensive inquiry that depends upon the circumstances surrounding a particular issue [and] the alleged misstatements . . . ."). In particular, relatively high "kick" rates do not necessarily demonstrate a red flag, as any loans that were kicked did not make it into the securitization pools, and elevated kick rates are somewhat to be expected for adverse sampling, which focuses on potentially high risk credit characteristics.

The court notes that Judge Cote granted summary judgment for the plaintiff, precluding the defendant from asserting the due diligence defense, in Fed. Hous. Fin. Agency v. Nomura Holding America, Inc., 2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014), a similar RMBS case. She concluded the

18

defendant's due diligence was unreasonable as a matter of law.  See id.  This court has benefited immensely from Judge Cote's thorough rulings in Fed. Hous. Fin. Agency throughout this litigation.  On this issue, however, the court respectfully declines to follow her approach.  As discussed, the question of reasonableness, in this and in other contexts, is generally a jury question, a principle Judge Cote herself acknowledged.  See id. at *1 ("The reasonableness of a defendant's due diligence investigation will, in most cases, be a question for the jury.  It is a mixed question of law and fact that will often hinge on disputed factual issues.  Even when it does not, reasonable minds could often disagree about whether a given investigation would have satisfied a prudent man in the management of his own property."); see also Barrepski v. Capital One Bank (U.S.A.) N.A., 2014 WL 935983, at * 6 (D.Mass. Mar. 7, 2014) ("[I]n the majority of cases, reasonableness is a jury question.").  Here, the court does not believe DBSI's reliance on the Acquisition Diligence was so deficient as to render it unreasonable as a matter of law and thus warrant taking the issue away from the jury.  In addition, although Fed. Hous. Fin. Agency is similar to this case, it does involve different facts.  Accordingly, the court will deny Plaintiff's motion as to nine of the securitizations.

The court, however, reaches a different conclusion as to the ACE 2007-HE4 securitization.[14]  The undisputed facts show that, for over 80% of the loan pools contributing to this securitization, no Acquisition Diligence was conducted.  Defendants contend that, as for the Chapel and MortgageIT loans in this securitization, DBSP had greater familiarity with and input into the product offerings and underwriting guidelines.  But greater familiarity and input in a general sense does not demonstrate the degree of care required for the due diligence defense; it does not demonstrate that DBSI or DBSP performed diligence reviews to ensure the loans had the characteristics represented

---

[14] As for the two securitization comprised entirely of loans from the CLG program, ACE 2006-ASAP4 and ACE 2007-ASAP1, the court rejects Plaintiff's assertion that Defendants have presented no evidence of diligence reviews.  In fact, Defendants have presented evidence showing Lydian conducted credit, compliance, and valuation reviews on 100% of the loans backing these securitizations.  Moreover, as Defendants explain, Federal Rule of Civil Procedure 56(c) permits a party to defeat summary judgment through any admissible evidence, not just documentary evidence, which is missing from the record through no fault of the parties.

in the offering documents.  In short, no reasonable jury could find in favor of DBSI on its due diligence defense as to the ACE 2007-HE4 securitization.

V.     CONCLUSION

For these reasons, the court ALLOWS Plaintiff's motion for partial summary judgment on Deutsche Bank's diligence affirmative defense (Dk. No. 333) as to the ACE 2007-HE4 securitization but otherwise DENIES the motion.

It is So Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge